D. W. SPRY, SR., ADMINISTRATOR OF D. W. SPRY, JR., v. E. L. KISER, PLEAS-
ANT GRIFFIN, AND DR. S. S. FLYNT, TRADING AS E. L. KISER COMPANY.

(Filed 7 April, 1920.)

**1. Evidence—Nonsuit—Trials.**

Upon a judgment of nonsuit upon the evidence the appellant is entitled
to have it considered as true and construed most favorably for him,
giving him the benefit of every inference that may reasonably be drawn
therefrom.

**2. Same—Druggists—Negligence—Damages.**

Evidence that a druggist was asked for, and guaranteed that he had
given his customer, pure sweet oil, for an infant who had theretofore
beneficially been given sweet oil to keep it in a good, healthy condition,
and that it was made violently sick, with vomiting and severe bowel
trouble, upon taking the usual sized dose of the oil in question; that
it recovered somewhat and was again made violently ill at the second
dose, which continued until its death about twelve days afterwards;
that the oil received from the druggist was rancid, and not sweet oil,
and would probably produce the sickness causing the death of the infant,
*Held*, sufficient for the determination of the jury as to whether the drug-
gist negligently supplied the rancid oil, and that it caused the death
of the infant, in an action against the druggist to recover damages for
its wrongful death.

CIVIL ACTION, tried before *McElroy, J.,* and a jury, at November
Term, 1919, of FORSYTH.

Plaintiff alleged that his intestate's death was caused by the negligence
of the defendants in selling him rancid and unwholesome oil to be ad-
ministered to the intestate during his last illness.

J. W. Newsom testified substantially: He is the maternal grand-
father of the child, had taken it into his household when it was but a
few months old to be nursed and reared, its mother, who was plaintiff's
daughter, having died at its birth. The child became ill, and its physi-
cian prescribed the use of sweet oil in stated doses. This oil, which they
had on hand, seemed to work well, and plaintiff went to the defendant's
drug store to get more oil, and called for sweet oil. He was handed a
bottle, for which he paid, and after it was given to the child the latter
became suddenly very ill during the night, and continued so until morn-
ing, having had 26 evacuations of the bowels, and did not recover, but
languished and died about 12 days afterwards. The child constantly
retched and tried to vomit. He was quite sick the next morning, but
was more quiet late in the evening, and the doctor advised that another
dose of sweet oil be given, and plaintiff gave the child another dose from
the same bottle. When the doctor came the second time, plaintiff asked
him to smell the bottle, which he did, and said, "That is stale, rancid,

and out of date. I know what to fight now; that is the cause of it."
He asked for whiskey and brandy was brought to him, and he said that
will not do in this case. Whiskey was then given to the child. The
doctor then told the witness to take the bottle of rancid oil back and
tell Mr. Griffin "to send a bottle of pure sweet oil, that is olive oil." I
told him I wanted olive oil. He then said to me that he knew that was
cottonseed oil when I bought from him before. The witness replied:
"The doctor says that is what is the cause of the child's sickness, and if
that kills the baby Mr. Spry is going to law you." Griffin then said:
"He can't hurt us as we did not make it." Witness then said to him:
"Mr. Griffin, suppose the State chemist comes around here and finds it,
what would you say?" Griffin replied, "I would say we kept it to grease
automobiles," and witness said, "Yes; and to kill babies." Dr. Flynt,
the attending physician, stated that "the child was as well developed as
any he had ever handled, his pulse never had varied one item." He
said this about one hour before the child died. The witness, J. W.
Newsom, testified further: "He was taken sick on the night of 18 July,
1916. We had been giving him sweet oil twice a week up until this
time; gave it to him Tuesday night and Friday night; that was simply
to make him sleep well and keep his bowels open; he had shown no signs
of sickness at this time. After the supply of sweet oil that they brought
to the house with the baby gave out I bought sweet oil from E. L. Kiser;
I bought five cents worth at the time so it would not get old. On 18
July I applied to E. L. Kiser & Company for a bottle of sweet oil; I
thought they were out of oil on the evening of 18 July, and I went to
the store and asked Mr. Francis Kiger if he had any more of that sweet
oil; Francis Kiger was a clerk in E. L. Kiser's store, and had been for
something like a year. He said he had no more 5-cent packages, but
had plenty of 10-cent packages. I said, 'That's all right, if it is pure
and all right.' He said, 'It is pure sweet oil; I will guarantee it.' I
bought it. The bottle shown me is what I bought from him on that
occasion. I carried it on home and gave the child not quite a teaspoon-
ful like I had been giving him. That was nine o'clock, and I took the
little fellow and went to bed, and I always took a bottle of milk and my
wife a bottle, and at eleven o'clock he had vomited all over the bed, and
was looking for the bottle. I nursed him to the bottle and he went off
to sleep again, and about one o'clock he woke me again hunting for his
bottle; I nursed him again and he had vomited again and discharged
all over the bed, and I woke up my wife, at one o'clock on the morning
of the 19th, and from then to day he had 26 actions and vomited con-
tinually until the doctor got there. I didn't notice anything else in his
condition at that time; his bowels kept moving all night as fast as we
could attend to him until the doctor got there. In a day or two after

that his mouth turned red like he had been eating pickled beets, and that lasted about a day and night, and then commenced coming a white scum in his mouth; that lasted a day or two and that went away, but he never did stop his vomiting." . . . "The baby had full front teeth, four above and four below, at four months old, and the doctor said he never heard of that or read of that before. We had four different doctors with the child; I told them to spare no expense or money, because I wanted to save the baby. The baby grew worse all the time, heaving and trying to vomit, and discharging; his mouth had peeled off; about the fourth or fifth day his mouth peeled off that white scum, and then there was running water from his mouth all the time, like a child slobbering. That kept up steady until he died, and when he died he was perfectly black all around his abdomen and his lips. I went up to Rural Hall the evening after the child was buried. Mr. Kiser, a member of the firm of E. L. Kiser & Company, spoke to me and said, 'D. W. is dead.' I said, 'Yes.' He said, 'Well, poor little sickly thing; he could never be raised nohow.' I said, 'Don't talk that. Ask Dr. Flynt.' Dr. Flynt was present and he cleared up his throat and said, 'You are mistaken, Mr. Kiser; that was the best developed baby I ever handled, and I have handled quite a few,' something along that line." . . .

"Dr. Spears came to my house one Sunday and asked me to let him go through the analysis of that oil. He read the analysis, and he said, 'God damn it, no wonder the baby died.' My wife heard him say that. I never told him I was going to bring suit; I might have told him Mr. Spry might bring suit." Other physicians were called in to see the child, but failed to stop the progress of the illness which resulted in its death on 1 August, 1916, when it was 6 months and 18 days old, having been born on 13 January, 1916. There was evidence that the child had been nourished with Horlick's Malted Milk, and perhaps other food, and had been stimulated with small doses of whiskey. He had been in good health and was a vigorous child until given the rancid oil, which almost immediately made him sick in the manner described.

Mrs. Tesh testified as follows: "I was living in Winston in 1916. I remember the death of Mrs. D. W. Spry, formerly Miss Nannie Newsome. I lived just about half a block from her. About three or four weeks after she died I took the baby. Mrs. Brewer had charge of the baby before I got it. He was nearly three months old when I carried him to his grandfather's, who lived at Rural Hall then. The baby was a little sick when I first took him; I thought he was hungry; I didn't have any doctor with him; I fed him little more than he had been getting, and he got along just fine; he never was sick at all while he was with me. He was a normal, healthy, good-sized child for his age at the time I turned him over to Mr. Newsome. I gave him sweet oil,

castor oil, and little baby medicines I always used with my own children. I told Mr. Newsome when I carried the baby there what I had done for it. I gave it oil more as a preventative than a cure. I think I saw the child three times after I carried it to Mr. Newsome's; went to his house to see it. It showed improvement every time I saw it; looked better and larger, growing as well as any child could. I have five children."

There was evidence of the analysis of the rancid oil by the State Chemist, which showed it to be cottonseed oil, and not sweet or olive oil. He states that sweet oil is made of olives exclusively, and not cottonseed oil. There has been an imitation made of cottonseed oil, but he knew of none being on the market recently. They have, in the past, made the cottonseed oil and labeled it sweet oil. There was much other evidence, but we have stated only what was necessary to an understanding of the question before us.

At the close of the testimony, the court entered a nonsuit and plaintiff appealed.

*Sapp & McKaughan, Holton & Holton* and *Dallas C. Kirby* for plaintiff.
*Jones & Clement, S. P. Graves,* and *Benbow, Hall & Benbow* for defendant.

WALKER, J., after stating the facts as above: When there is a nonsuit upon the evidence, the appellant, as we have so often said, is entitled to have it considered as true and construed most favorably for him, and, he must also have the benefit of every inference that may reasonably be drawn therefrom. *Brittain v. Westhall,* 135 N. C., 492; *In re Will of Margaret Deyton,* 177 N. C., 503; *Angel v. Spruce Co.,* 178 N. C., 621. We do not pass upon the sufficiency of the evidence, but, as said in the *Margaret Deyton case, supra:* "In the case of a nonsuit or dismissal under the statute, the court does not weigh the evidence, but merely assumes it to be true in favor of the defeated party." If the evidence in this case is tested by this rule, it will be found ample for the jury to consider. The witness J. W. Newsome stated that he applied to Francis Kiger, the clerk in the defendant's store, for sweet oil, not cottonseed oil, and Kiger said he had no more 5-cent packages, but had 10-cent packages, thereupon the witness replied, "That will do if it is pure and all right." Kiger then stated, "It is pure sweet oil; I will guarantee it," and Newsome purchased a bottle, when he returned home he gave the child the usual quantity in a spoon, and very soon thereafter he was taken suddenly and seriously sick, in the manner described by the witness, and died from this illness about two weeks afterwards. When he smelled

the liquid in the bottle it was found to be "rancid," which word means having a rank smell or taste from chemical change or decomposition. There can be no doubt of there being *evidence* that the oil caused the sickness, which resulted in the child's death, without resorting to the doctor's expert opinion as a part of the evidence. But he was asked to smell the bottle, and to state if the rancid oil did not cause the vomiting and other symptoms, the doctor answering, "That is stale, rancid, and out of date. I know what to fight now; that is the cause of it," and Mr. Griffin, one of the defendants, stated, when asked by the witness if the State Chemist should find him with such oil, "I would say we kept it to grease automobiles," and the witness added, "Yes, to kill babies." When another doctor read the analysis of the oil, as made by the State Chemist, he remarked with profane emphasis, "No wonder the baby died." We conclude, therefore, that there is evidence that rancid oil was sold to the plaintiff for the child, and that it caused its death, but this would not be sufficient for a recovery unless it was sold negligently. It is not our purpose to enter upon an extensive discussion of the law in regard to the liability of apothecaries, druggists, and pharmacists in the conduct of their business, a few general principles will suffice in this appeal, where the facts may not all be before us. It is said in 19 Corpus Juris, at pp. 780 and 781: "The law imposes upon a druggist the duty so to conduct his business as to avoid acts in their nature dangerous to the lives of others, and one who is negligent in the performance of such duty is liable for damages to any person injured thereby. Where a druggist's clerk, in the course of his employment, negligently supplies a harmful drug in lieu of a harmless one called for, either by prescription or otherwise, and injury results from taking it, the druggist will be liable in damages." . . . "A druggist who negligently delivers a deleterious drug when a harmless one is called for is responsible to the customer for the consequences, as being guilty of a breach of the duty which the law imposes on him to avoid acts in their nature dangerous to the lives of others. The liability of the druggist in such case is not affected by the fact that he may also be subject to criminal prosecution, nor by the facts that the one purchasing the drug does not disclose the person for whom he is making the purchase."

The principle is thus stated in 9 Ruling Case Law, at pp. 702 and 703: "The public safety and security against the fatal consequences of negligence in keeping, handling, and disposing of dangerous drugs and medicines is a consideration to which no druggist can safely close his eyes. An imperative social duty requires of him such precautions as are liable to prevent death or serious injury to those who may, in the ordinary course of events, be exposed to the dangers incident to the traffic in which he is engaged, and it is therefore incumbent upon him to under-

stand his business, to know the properties of his drugs, and to be able to distinguish them from each other. It is his duty so to qualify himself, or to employ those who are so qualified, to attend to the business of compounding and vending medicines and drugs, as that one drug may not be sold for another; and so that, when a prescription is presented to be made up, the proper medicines, and none others, be used in mixing and compounding it. . . . A person engaged in the business of pharmacy holds himself out to the public as one having the peculiar learning and skill necessary to a safe and proper conducting of the business, while the general customer is not supposed to be skilled in the matter, and frequently does not know one drug from another, but relies on the druggist to furnish the article called for. . . . He must use due care to see that he does not sell to a purchaser or send to a patient a poison in place of a harmless drug, or even one innocent drug, calculate to produce a certain effect, in place of another sent for and designed to produce a different effect, and it is well settled that he will be liable for any injury proximately resulting from his negligence. Where death is caused by the negligence of a druggist the recovery of damages is governed by the usual rules relating to actions for wrongful death generally."

Speaking of the measure of care required of a druggist in selling drugs and medicines, it is said in 9 Ruling Case Law, at p. 704, sec. 11: "The legal measure of the duty of druggists towards their patrons, as in all other relations of life, is properly expressed by the phrase 'ordinary care,' yet it must not be forgotten that it is 'ordinary care' with reference to that special and peculiar business, and in determining what degree of prudence, vigilance, and thoughtfulness will fill the requirements of 'ordinary care' in compounding medicines and filling prescriptions, it is necessary to consider the poisonous character of many of the drugs with which the apothecary deals, and the grave and fatal consequence which may follow the want of due care. For the people trust not merely their health but their lives to the knowledge, care, and skill of druggists, and in many cases a slight want of care is liable to prove fatal to some one. It is therefore proper and reasonable that the care required shall be proportioned to the danger involved."

Another definition is "that ordinary care, in reference to the business of a druggist, must be held to signify the highest practicable degree of care consistent with the reasonable conduct of the business. *Wilson v. Faxon,* 208 N. Y., 108 (Ann. Cases, 1914, D. 49; 47 L. R. A. (N. S.), 693, and note); *Peters v. Johnson,* 50 W. Va., 644 (88 A. S. R., 909; 57 L. R. A., 428).

Plaintiff alleges that the defendants represented the contents of the bottle to be genuine sweet oil of standard purity, and also expressly warranted it to be of that kind and quality, and he offered evidence to prove

the truth of the allegation. He sues both on tort for negligence and on contract because of the warranty. It is not required of us to lay down the rule of damages upon either cause of action, as if he shows the actionable wrong, or the contract and its breach, he is entitled to some damages, even though they may be nominal, and this prevents a nonsuit.

The court erred in dismissing the action. Its judgment of nonsuit will be set aside, and a new trial ordered.

Error.