ALICE M. BATISTE v. AMERICAN HOME PRODUCTS CORPORA-
TION, A DELAWARE CORPORATION; WYETH LABORATORIES, INC.,
A NEW YORK CORPORATION; DR. HENRY J. RITCHIE; AND PIKE'S
DRUG STORE, INC., A NORTH CAROLINA CORPORATION

No. 7619SC438

(Filed 5 January 1977)

1. Physicians, Surgeons and Allied Professions § 11; Uniform Commercial
Code § 15— issuance of prescription for drug — inapplicability of war-
ranties of fitness and merchantability

A physician's issuance of a prescription for an oral contraceptive
drug did not constitute a "sale" of the drug within the meaning of .
sections of the Uniform Commercial Code applicable to implied war-
ranties of fitness and merchantability, and the physician is not liable
to the patient for adverse reactions caused by the drug in the absence
of negligence or intentional misconduct. G.S. 25-2-314; G.S. 25-2-315.

2. Sales § 22— druggist's sale of prescription drug — insufficient allega-
tions of negligence

Plaintiff's complaint failed to state a claim for relief against
defendant drug store based on negligence in the sale of an oral con-
traceptive drug to plaintiff where plaintiff alleged that she obtained
a prescription for the drug from a physician and that defendant filled
the prescription as directed by selling her a quantity of the drug in
the sealed package as prepared by the manufacturer, and there was
no allegation that the druggist did any compounding or added to or
took from the product as contained in the sealed container, that the
druggist did anything to change the prescription given him, or that
the drug delivered to plaintiff was in any way different than the
drug prescribed by plaintiff's physician or that it contained any
foreign material.

1

Batiste v. Home Products Corp.

3. **Sales § 22— druggist's sale of prescription drug — inapplicability of strict liability**

The doctrine of strict liability without fault does not apply in an action against a retail druggist to recover for injuries resulting from the use of a drug compounded or sold in compliance with a physician's order.

4. **Sales § 22; Uniform Commercial Code § 15— druggist's sale of prescription drug — warranties of merchantability and fitness**

Implied warranties of merchantability and fitness did not apply to a druggist's sale to plaintiff of an oral contraceptive drug prescribed by plaintiff's physician where plaintiff did not allege any deleterious, poisonous or harmful ingredient in the drug which constituted a breach of an implied warranty of fitness, and where plaintiff's allegations did not sustain the position that she relied "on the seller's skill or judgment to select or furnish suitable goods." G.S. 25-2-314; G.S. 25-2-315.

APPEAL by plaintiff from *Lupton, Judge.* Judgment entered 3 February 1976, in Superior Court, CABARRUS County. Heard in the Court of Appeals 12 October 1976.

By this action, instituted on 30 September 1975, plaintiff seeks to recover damages for a severe stroke allegedly suffered as the result of taking Ovral, an oral contraceptive drug.

Briefly summarized, her complaint alleges that on 2 October 1972, she consulted defendant, Dr. Henry J. Ritchie " . . . in his professional capacity as said practicing physician, for the purpose of securing medical services and advice with respect to the prevention of pregnancy and the use of birth control devices," and that the relationship of physician and patient existed between Dr. Ritchie and plaintiff. "On October 2, 1972, the defendant, Dr. Henry J. Ritchie, in his professional capacity as said practicing physician, undertook to render medical services and advice to the plaintiff with respect to the prevention of pregnancy and the use of birth control devices and in the course thereof said defendant issued and delivered to the plaintiff a written prescription for the purchase, use and consumption by the plaintiff of said oral contraceptive drug commonly known and sold under the trademark or tradename of 'Ovral'." Plaintiff took the prescription to the defendant Pike's Drug Store, Inc., where she was sold a certain quantity of Ovral " . . . in the sealed package or container and in the same condition and composition as originally manufactured, designed, prepared, packaged, promoted, marketed, distributed,

sold and delivered to the defendant, Pike's Drug Store, Inc., by the defendants, American Home Products Corporation and Wyeth Laboratories, Inc." Ovral was a " . . . combined drug preparation containing 0.05 mg. of esthinyl estradiol, an estrogen ingredient or compound, which caused numerous harmful side effects and dangerous adverse reactions, including clotting of the blood and severe strokes, in the ultimate users and consumers of said oral contraceptive drug . . . " and, by reason thereof, the drug was " . . . defective, unreasonably and inherently dangerous, unsafe and unfit for human use, and consumption for its intended purpose and use by the ultimate users . . . including the plaintiff herein." The defendants, and each of them, knew that the drug would be prescribed, sold, purchased, used and consumed without inspection by sellers or prescribers for defects. Plaintiff took the prescribed Ovral from 2 October 1972, through 18 November 1972, and on 19 November 1972, she suffered a severe stroke.

The complaint alleges several claims for relief against each of the defendants. The first nine claims for relief are directed to defendants American Home Products Corporation and Wyeth Laboratories, Inc. The tenth claim for relief is grounded on Dr. Ritchie's alleged negligence in treating plaintiff in prescribing the drug in twelve particulars. The eleventh claim for relief is grounded upon Dr. Ritchie's breach of an implied warranty of fitness. The twelfth claim for relief is grounded upon Dr. Ritchie's breach of an implied warranty of merchantability. The thirteenth, fourteenth, fifteenth and sixteenth claims for relief are directed to defendant Pike's Drug Store and are grounded on theories of negligence, strict liability in tort, implied warranty of fitness, and implied warranty of merchantability.

Defendant Dr. Ritchie moved in writing that all claims for relief against him be dismissed for that each claim for relief failed to state a cause of action against him. The court allowed the motion as to the eleventh and twelfth claims only, finding as a fact in the order that " . . . there is no just reason for delay in the entry of said Order [of dismissal] and that said Order constitutes a final adjudication and decision of the rights and liabilities . . . " between plaintiff and Dr. Ritchie upon those two claims for relief.

Defendant Pike's Drug Store, Inc., also moved under the provisions of Rule 12(b)(6) to dismiss the cause of action as

to it for failure of the complaint to state a claim upon which relief can be granted. This motion was allowed, and the order entered also complied with the provisions of Rule 54.

Plaintiff appeals from the entry of each of the orders.

*Mraz, Aycock, Casstevens & Davis, by Gary A. Davis and Hunter Meacham, for plaintiff appellant.*

*Golding, Crews, Meekins, Gordon & Gray, by John G. Golding and C. Byron Holden, for Dr. Henry J. Ritchie, defendant appellee.*

*Hartsell, Hartsell & Mills, P.A., by William L. Mills, Jr. for Pike's Drug Store, Inc., defendant appellee.*

MORRIS, Judge.

Plaintiff notes in her brief that the claims against defendant Ritchie which were dismissed are interrelated and, therefore, she discusses them together in her brief. We agree that they are sufficiently interrelated to allow single discussion and, accordingly, will follow plaintiff's format.

[1] Plaintiff first argues that the issuance of a prescription for Ovral by defendant Ritchie to plaintiff constituted a transaction covered by those sections of the Uniform Commercial Code applicable to implied warranties of fitness and merchantability. G.S. 25-2-314 provides:

"(1) Unless excluded or modified (§ 25-2-316), a warranty that the goods shall be merchantable is implied in a contract for their sale if the seller is a merchant with respect to goods of that kind. Under this section the serving for value of food or drink to be consumed either on the premises or elsewhere is a sale.

(2) Goods to be merchantable must be at least such as

(a) pass without objection in the trade under the contract description; and

(b) in the case of fungible goods, are of fair average quality within the description; and

(c) are fit for the ordinary purposes for which such goods are used; and

(d) run, within the variations permitted by the agreement, of even kind, quality and quantity within each unit and among all units involved; and

(e) are adequately contained, packaged, and labeled as the agreement may require; and

(f) conform to the promises or affirmations of fact made on the container or label if any.

(3) Unless excluded or modified (§ 25-2-316) other implied warranties may arise from course of dealing or usage of trade."

G.S. 25-2-315 provides:

"Where the seller at the time of contracting has reason to know any particular purpose for which the goods are required and that the buyer is relying on the seller's skill or judgment to select or furnish suitable goods, there is unless excluded or modified under the next section [§ 25-2-316] an implied warranty that the goods shall be fit for such purpose."

The Uniform Commercial Code defines "merchant" as ". . . a person who deals in goods of the kind or otherwise by his occupation holds himself out as having knowledge or skill peculiar to the practices or goods involved in the transaction . . ." G.S. 25-2-104(1). A "sale" is defined as a transaction consisting ". . . in the passing of title from the seller to the buyer for a price." G.S. 25-2-106(a).

Plaintiff earnestly contends that the physician who issues a prescription for an oral contraceptive drug is a "seller" within the meaning of the statute and that the issuance of the prescription constitutes passing title. She argues that the physician's role in the chain of distribution of drugs is admittedly unique but is a vital link in the chain. Because the physician is the only person vested with legal authority to place the drug manufacturer's product in the hands of the consumer, and unless the physician issues a prescription for the manufacturer's product, the manufacturer cannot long exist in the industry. Therefore, the plaintiff argues, the manufacturer is willing to and does expend large sums of money and a great amount of the time of its salesmen to place in the hands of physicians literature with respect to the particular drugs manufactured by it and samples

of the drugs. All this is done to encourage the physician to prescribe the drug manufactured by it—to "sell" the particular drug, as plaintiff would have it. While plaintiff's argument may be ingenuous, it is not, in our opinion, either factually or legally sound. The Uniform Commercial Code was designed to apply to transactions between a seller and a purchaser. Inherent in the legislation is the recognition that the essence of the transaction between the retail seller and the consumer relates to the article sold, and that the seller is in the business of supplying the product to the consumer. It is the product and that alone for which he is paid. The physician offers his professional services and skill. It is his professional services and his skill for which he is paid, and they are the essence of the relationship between him and his patient. To say that the issuance of a prescription for drugs, which prescription is to be filled by a pharmacist should the patient desire to follow the physician's suggestion, constitutes the transfer of title to the drugs in the formula in the prescription, is simply too unrealistic for serious consideration.

The fact remains that one does not normally go to a physician to purchase medicines or drugs or bandages or other items incidental to medical treatment. Plaintiff alleged in her complaint that she "employed and consulted with" defendant in his professional capacity *"for the purpose of securing medical services and advice."* A case strikingly similar to the one now before us is *Carmichael v. Reitz,* 17 Cal. App. 3d 958, 95 Cal. Rptr. 381 (1971). There plaintiff sought to recover damages from the defendant physician for pulmonary embolisms and thrombophlebitis allegedly caused by defendant's having prescribed Enovid in treating plaintiff for endometriosis. The Court first held that there was insufficient evidence of negligence to allow the case to go to the jury. It then considered and rejected plaintiff's contention that she should have been permitted to go to the jury on the theory that the defendant was, in a sense, a retailer of Enovid and that, therefore, strict liability in tort imposed on retailers of products should have been applied. The Court recognized that the doctrine of strict liability is no longer restricted to sales transactions, but also recognized that ". . . the distinction between a transaction where the primary objective is the acquisition of ownership or use of a product and one where the dominant purpose is to obtain services has not been obliterated. Where the services sought are

professional in character, the distinction applies *a fortiori.*" *Id.*
at 978, 95 Cal. Rptr. at 392. Further, the Court said that,

> ". . . there is a difference in status or classification be-
> tween those upon whom the courts have heretofore imposed
> the doctrine of strict liability and a physician who pre-
> scribes an ethical drug to achieve a cure of the disorders
> for which the patient has sought his professional services.
> The former acts basically as mere conduits to the distribu-
> tion of the product to the consumer; the latter sells or fur-
> nishes his services as a healer of illnesses. The physician's
> services depend upon his skill and judgment derived from
> his specialized training, knowledge, experience, and skill.
> The physician prescribes the medicine in the course of
> chemotherapy only as a chemical aid or instrument to
> achieve a cure. A doctor diagnosing and treating a patient
> normally is not selling either a product or insurance." *Id.*
> at 979, 95 Cal. Rptr. at 393.

See also *Magrine v. Krasnica*, 94 N.J. Super. 228, 227 A. 2d
539 (1967), *aff'd.*, 100 N.J. Super. 223, 241 A. 2d 637 (1968);
*Cheshire v. Southampton Hospital Association*, 53 Misc. 2d 355,
278 N.Y.S. 2d 531 (1967); *Foster v. Memorial Hospital Associa-
tion of Charleston*, _____ W.Va. _____, 219 S.E. 2d 916 (1975).

We adhere to the general and majority rule that those who,
for a fee, furnish their professional medical services for the
guidance and assistance of others are not liable in the absence
of negligence or intentional misconduct. We, therefore, hold that
the court committed no error in dismissing the eleventh and
twelfth claims for relief.

### As to Pike's Drug Store, Inc.

[2]   Plaintiff's thirteenth claim for relief is grounded on neg-
ligence and seeks recovery against Pike's Drug Store, Inc., for
its failure to warn plaintiff of ". . . the numerous risks, haz-
ards, contraindications, harmful side effects and dangerous ad-
verse reactions, including clotting of the blood, and severe
strokes, inherent in the human use and consumption of said
oral contraceptive drug of which said defendant knew or in
the exercise of reasonable care should have known." The com-
plaint also alleges that defendant Pike's Drug Store, Inc., failed
adequately to warn plaintiff that human consumption of the
drug could cause clotting of the blood and severe strokes and

that defendant sold the drug to plaintiff for her use when defendant knew or should have known that it was ". . . unreasonably and inherently dangerous, unsafe, unfit and defective for human use and consumption as a contraceptive drug . . ." and would likely cause harmful side effects including clotting of the blood and severe strokes.

Plaintiff cites authority for the proposition that a druggist has a duty to act with due, ordinary, care and diligence in compounding and selling drugs. We certainly do not disagree with this principle. Plaintiff also calls our attention to *Spry v. Kiser,* 179 N.C. 417, 102 S.E. 708 (1920), and *Davis v. Radford,* 233 N.C. 283, 63 S.E. 2d 822 (1951). In *Spry,* the druggist had sold a bottle of rancid cottonseed oil for consumption by a baby rather than the sweet oil requested. The Court, in reversing a nonsuit, said:

> " 'The public safety and security against the fatal consequences of negligence in keeping, handling, and disposing of dangerous drugs and medicines is a consideration to which no druggist can safely close his eyes. An imperative social duty requires of him such precautions as are liable to prevent death or serious injury to those who may, in the ordinary course of events, be exposed to the dangers incident to the traffic in which he is engaged, and it is therefore incumbent upon him to understand his business, to know the properties of his drugs, and to be able to distinguish them from each other. It is his duty so to qualify himself, or to employ those who are so qualified, to attend to the business of compounding and vending medicines and drugs, as that one drug may not be sold for another; and so that, when a prescription is presented to be made up, the proper medicines, and none others, be used in mixing and compounding it. . . . A person engaged in the business of pharmacy holds himself out to the public as one having the peculiar learning and skill necessary to a safe and proper conducting of the business, while the general customer is not supposed to be skilled in the matter, and frequently does not know one drug from another, but relies on the druggist to furnish the article called for. . . . He must use due care to see that he does not sell to a purchaser or send to a patient a poison in place of a harmless drug, or even one innocent drug, calculate to produce a certain effect, in place of another sent for and designed to produce

a different effect, and it is well settled that he will be liable for any injury proximately resulting from his negligence. Where death is caused by the negligence of a druggist the recovery of damages is governed by the usual rules relating to actions for wrongful death generally.' " 179 N.C. at 421-22, 102 S.E. at 710.

In *Davis,* plaintiff had brought an action against a retail druggist for damages for breach of implied warranty of wholesomeness in the sale to his intestate of an article for human consumption known as "Westal." Plaintiff alleged the product contained poisonous ingredients which caused intestate's death. The druggist joined his supplier, who demurred to the cross-complaint. The demurrer was overruled and the supplier appealed. The Court held that the druggist could join his supplier and file a cross-action against the supplier on the ground that the supplier had impliedly warranted to the druggist that the article was fit for human consumption, and the supplier was primarily liable for injuries resulting from that breach of warranty.

We fail to see the applicability of either case. Here plaintiff alleges that she had consulted a physician, obtained a prescription and carried it to defendant Pike's Drug Store, Inc., to be filled. The prescription was filled as directed. There is no allegation that the product was other than it was supposed to be. There is no allegation that the druggist did any compounding or added to or took from the product as prepared and contained in the sealed container, or that the druggist did anything to change the prescription given him, or that the drug delivered to plaintiff was in any way different than the drug prescribed by plaintiff's physician, or contained any foreign material. Certainly defendant is not qualified or licensed to advise plaintiff with respect to the best oral contraceptive for *her* to use to prevent pregnancy. Defendant is not a physician. Perhaps had a druggist employed by defendant undertaken to *prescribe* the oral contraceptive she took or to advise her concerning it, the result might be different. That question is not before us. We are of the opinion that the trial court properly dismissed plaintiff's thirteenth claim for relief.

[3] Plaintiff's fourteenth claim for relief is grounded on the legal theory of strict liability in tort. Plaintiff concedes that North Carolina has not adopted this theory as applied to re-

tailers, but argues that the situation of a drug store selling packaged drugs is analagous to situations in which North Carolina has placed liability on a defendant regardless of fault. She gives as examples blasting operations, private nuisance, defamation, and vicarious liability. She argues further that the Twentieth Century has been a changing era and that technological changes and scientific advances have produced a multitude of new products available to the consuming public. Of course, the medical profession and pharmaceutical industry have participated in this, and the result is a drug-conscious society. Nevertheless, we do not think all of this, true though it may be, requires that we hold a retail druggist liable without fault because of injuries and damage resulting from the use of a drug compounded or sold in strict compliance with the physician's order, in the absence of any knowledge which would constitute negligence.

In *McLeod v. W. S. Merrell Co.*, 174 So. 2d 736 (Fla. 1965), the plaintiff sought to recover damage for injuries suffered as the result of ingesting a drug known as "Mer/29" which she had purchased in a sealed container from a druggist in compliance with a physician's prescription given for the purpose of controlling body cholesterol. The count in the complaint against the druggist was based on breach of implied warranty. The Court, however, noted that in effect the plaintiff was asking the court to impose upon retail prescription druggists an absolute, strict liability without fault in an action in tort in reliance upon the rapidly evolving concept of strict liability without fault. The Florida Court was unwilling to do so. The Court said:

> "The concept of strict liability without fault should not be applied to the prescription druggists in the instant situation. Rather, it appears to us, that the rights of the consumer can be preserved, and the responsibilities of the retail prescription druggist can be imposed, under the concept that a druggist who sells a prescription warrants that (1) he will compound the drug prescribed; (2) that he has used due and proper care in filling the prescription (failure of which might also give rise to an action in negligence); (3) the proper methods were used in the compounding process, (4) the drug has not been infected with some adulterating foreign substance." (Citations omitted.) *Id.* at 739.

Batiste v. Home Products Corp.

While it is true that The American Law Institute in its restatement of the law provides for strict liability of the seller of a product, Restatement (Second) of Torts, § 402A (1965), it is interesting to note that, by comment k to § 402A, retail prescription druggists are excepted. The comment noted that, as an example, the vaccine for the Pasteur treatment of rabies frequently leads to serious consequences to the person injected with it. Nevertheless, the disease itself invariably leads to a terrible death, and the marketing and use of the drug is fully justified.

> " . . . Such a product, properly prepared, and accompanied by proper directions and warning, is not defective, nor is it *unreasonably* dangerous. The same is true of many other drugs, vaccines, and the like, many of which for this very reason cannot legally be sold except to physicians, or under the prescription of a physician. It is also true in particular of many new or experimental drugs as to which, because of lack of time and opportunity for sufficient medical experience, there can be no assurance of safety, or perhaps even of purity of ingredients, but such experience as there is justifies the marketing and use of the drug notwithstanding a medically recognizable risk. The seller of such products, again with the qualification that they are properly prepared and marketed, and proper warning is given, where the situation calls for it, is not to be held to strict liability for unfortunate consequences attending their use, merely because he has undertaken to supply the public with an apparently useful and desirable product, attended with a known but apparently reasonable risk."

See also *Coffer v. Standard Brands,* 30 N.C. App. 134, 226 S.E. 2d 534 (1976).

The trial court properly dismissed plaintiff's fourteenth claim.

[4] Plaintiff's fifteenth and sixteenth claims for relief are grounded on implied warranties of fitness and merchantability. While we recognize that there are differences in the warranties, we do not think either lies in this situation, and we, therefore, combine the two claims for relief for discussion. Plaintiff calls attention to N.C.G.S. 25-2-314 which provides for an implied warranty of merchantability that the goods sold ". . . are fit for the ordinary purposes for which such goods are used . . ." and also that they ". . . conform to the promises or affirma-

---

Batiste v. Home Products Corp.

---

tions of fact made on the container or label, if any"; and N.C.G.S. 25-2-315, which provides that "[w]here the seller at the time of contracting has reason to know any particular purpose for which the goods are required and that the buyer is relying on the seller's skill or judgment to select or furnish suitable goods, there is unless excluded or modified under the next section [§ 25-2-316] an implied warranty that the goods shall be fit for such purpose." Assuming *arguendo* that the implied warranties are applicable, plaintiff does not allege what deleterious or poisonous or harmful ingredient the Ovral purchased on her doctor's prescription contained which constituted a breach of an implied warranty of fitness, nor do her allegations sustain the position that she relied "on the seller's skill or judgment to select or furnish suitable goods." She alleged that she obtained a prescription from her physician and that defendant druggist filled that prescription. There is no allegation that defendant druggist added anything thereto or selected anything for plaintiff to take. Nor is this a situation where plaintiff made her choice from items selected and displayed by the druggist for sale to the general public. See generally *Adams v. Tea Co.*, 251 N.C. 565, 112 S.E. 2d 92 (1960) ; *Spry v. Kiser, supra,* and *Coffer v. Standard Brands, supra.* Here the drug purchased by plaintiff was not available to the general public in the sense that it was available for purchase by any customer who came in the drug store, selected it from the shelf, and paid the price therefor. It was available only to those who had previously seen their physician and obtained from the physician a prescription directing the druggist to supply the drug. Obviously the plaintiff patient did not rely on the druggist's skill or judgment in assuming that the drug would be fit for its intended purpose. This reliance had been properly placed with her physician. We are not willing to extend the applicability of implied warranties of fitness and merchantability to this situation and agree with the trial court in dismissing these two claims for relief.

For the reasons stated herein the order of the trial court is

Affirmed.

Judges HEDRICK and ARNOLD concur.