**Patricia KALINOWSKI and Thomas Kalinowski, Plaintiffs,**

**v.**

**E.I. DU PONT DE NEMOURS AND COMPANY, Defendant.**

**Civ. A. No. 92–2511.**

United States District Court, E.D. Pennsylvania.

Jan. 12, 1994.

**150**

Timothy T. Stevens and Howard S. Stevens, Stevens & Johnson, Allentown, PA, for plaintiffs.

Gay Barlow Parks Rainville, Pepper, Hamilton & Scheetz, Philadelphia, PA, for defendant.

## *MEMORANDUM*

TROUTMAN, Senior District Judge.

Plaintiff Patricia Kalinowski seeks damages for personal injuries allegedly resulting from the failure of a temporomandibular joint (TMJ) prosthesis fashioned from Proplast, a patented and trademarked product manufactured and sold by a now bankrupt entity, Vitek.[1] Defendant DuPont manufac-

---

1. The temporomandibular joint (TMJ) is the portion of the jaw mechanism which permits normal movement of the jawbone. When the articulating portion of the jaw bone which fits into the joint becomes diseased, replacement of the TMJ becomes necessary in order to restore normal mobility. (*See* Exhibits to Memorandum of Law in Support of Motion of Defendant for Summary Judgment, (Doc. # 22), Exh. C–2, Excerpt from 2/5/92 Deposition of Charles A. Homsy, Sc.D., at 43).

Proplast itself was specifically designed and developed as a material for use within the human body in various applications, such as rebuilding portions of the bony structure of the face when deformed as a result of accident or congenital abnormalities. (*Id.* at 46—48). The innovation inherent in the material known as Proplast was its porosity, which promoted the ingrowth of human tissue, which, in turn, tended to stabilize implants. (*Id.* at 40, 46, 49; Excerpt from Hom-

tures and sells polytetraflourethylene (PTFE), a component of Proplast, which is sold under the tradename Teflon.[2] Plaintiff Thomas Kalinowski likewise seeks damages for loss of consortium as a result of his wife's alleged injuries.

In their complaint plaintiffs assert four separate theories of liability. First, they allege that defendant is subject to strict liability in tort in that it designed, manufactured and sold a product defective for use within the human body and failed to adequately warn the ultimate users of the product, *i.e.*, doctors who perform TMJ replacement surgery and their patients, of known risks associated with the use of artificial joints containing PTFE. (Count I). Second, plaintiffs assert that defendant breached its express and implied warranty that PTFE is safe and fit for use as a component part in an artificial joint, the purpose for which defendant knew it was purchased by Vitek, manufacturer of both Proplast and the entire TMJ replacement implanted into Patricia Kalinowski. (Count II). Third, plaintiffs allege that defendant's conduct relating to the sale of PTFE as a component of Proplast amounted to fraud and intentional or negligent misrepresentation upon which Patricia Kalinowski relied and was thereby injured. (Count III). Finally, plaintiffs allege that defendant was negligent in selling PTFE for use in human implants and in failing to adequately warn the manufacturer of Proplast and the ultimate users thereof of the dangers of implanting PTFE in the human body despite its knowledge of the problems associated with such implants. (Count IV).

Defendant has moved for summary judgment, contending that it owed no duty to plaintiffs under any theory of liability in that it is only a bulk supplier of a raw material used in the fabrication of Proplast, a product materially different from PTFE. Defendant asserts that bulk suppliers of raw materials used in medical products which are regulated by the Food and Drug Administration owe no duty of any kind to ultimate consumers since, pursuant to the regulatory scheme, such duties are explicitly owed by the product manufacturers and by physicians who use such products. Defendant further contends that bulk suppliers of raw materials which are not inherently defective owe no duty to end users to warn of potential problems which might arise from use of the product in unusual applications and owe no duty to such end users to assure the safety of products derived from special applications of the raw material. Defendant also asserts that it owed no duty to warn ultimate consumers of products containing PTFE of any potential problems with the medical application of the finished product since the raw material was sold to a "sophisticated user" with independent knowledge of the potential risks as well as an independent duty to warn of possible dangers associated with such use. Finally, defendant contends that after leaving its control the PTFE it manufactured and sold was substantially changed by the intermediate purchaser via the process of fashioning Proplast and, therefore, did not reach the ultimate consumer in the same condition in which it was sold.

Defendant notes that its contentions concerning the duties imposed by FDA regulation and the extent of the duties owed to ultimate consumers where the product sold as a component of a finished product is not inherently dangerous apply to both the strict liability and negligence theories of liability. Defendant further notes that its "sophisticated purchaser" argument applies only to the negligence claims, while the "substantial change" argument applies only to the strict liability claims.

---

sy Deposition of 6/7/92 at 725–727). In addition, it was discovered that Proplast, formed into a block, was easily carved and could be molded into various shapes for multiple applications in reconstructive surgery. (*Id.* 2/5/92 Deposition Excerpt at 46).

**2.** Defendant also manufactures and sells FEP, another form of Teflon incorporated into the TMJ prosthesis. It is not clear, however, whether DuPont, directly or indirectly, sold the FEP which was laminated to the Proplast in the prosthesis here involved. There are, apparently, other suppliers of FEP which sold their products to Vitek. (*See* Exh C–2 to Doc. # 22, Homsy Deposition of 6/6/92 at 184). Similarly, it is not clear whether the FEP portion of the implant contributed to plaintiff's injuries.

In response, plaintiffs argue that defendant's motion refers only to the PTFE it admittedly sold to Vitek for use as a component in its Proplast product while plaintiffs' claims likewise extend to the sale of FEP, a pure form of Teflon laminated to one side of the TMJ prosthesis implanted into Patricia Kalinowski. Consequently, plaintiffs argue that defendant's request for judgment fails on this basis alone. Plaintiffs further contend that defendant's duty to warn ultimate consumers of the dangers of Teflon when implanted in the human body is not abrogated by FDA regulation of medical devices, and, therefore, presents a jury question with respect to whether such duty exists and was breached. Plaintiffs also contend that DuPont cannot rely upon the "sophisticated user" defense in that it had reason to know that Vitek and its founder/principal, Charles Homsy, were not likely to forward critical information concerning the danger of incorporating PTFE/FEP into the TMJ prosthesis to doctors and patients, the ultimate users of the products. With respect to the "substantial change" contention, plaintiffs point to the factual record, including expert deposition testimony, to demonstrate that neither the process of manufacturing Proplast nor the fabrication of the TMJ prosthesis itself resulted in a fundamental change to the Teflon incorporated therein. Finally, plaintiffs argue that their warranty and misrepresentation claims are supportable since it is clear from the record that DuPont continued to sell its Teflon product(s) to Vitek for use in TMJ implants until 1989, long after defendant was fully apprised of the specific problems inherent in the use of Teflon in such a manner and of the failure of Vitek to adequately warn physicians and their patients of the danger of Proplast/Teflon implants.

Despite the voluminous record produced by the parties in support of their respective positions, including many court decisions from various jurisdictions, it is clear that the fundamental question presently before this Court is whether, pursuant to the law of Pennsylvania, plaintiffs' various claims are cognizable under the relevant factual circumstances, which we will now relate.[3]

Charles Homsy, a former DuPont employee, first became interested in the medical community's need for biocompatible materials for surgical implants in the mid–1960's as a result of medical problems experienced by his daughter. (See Exhibits to Memorandum of Law in Support of Motion of Defendant for Summary Judgment, (Doc. #22), Exh. C–2, Excerpt from 6/7/92 Deposition of Charles A. Homsy, Sc.D., at 699–712). Although Homsy's education and work experience were in the field of chemical engineering, he was ultimately invited by Methodist Hospital in Houston, Texas, to establish a biomedical engineering research facility to explore the use of polymers for prosthetic devices. (Id., Excerpt from 2/5/92 Deposition of Charles A. Homsy, Sc.D., at 10—12; Homsy Deposition of 6/7/92 at 700–701). Subsequently, Dr. Homsy patented the material known as Proplast, which contained DuPont's PTFE as a component part and which had various uses in both orthopedic and plastic surgery applications. (See note 1, supra).

One of the applications of Proplast, developed in consultation with John Kent, D.D.S., was the subject TMJ prosthesis, which also incorporated FEP. (Id., Excerpt from Homsy Deposition of 3/23/90 at 96–103).

In the course of developing Proplast, Homsy sought to purchase PTFE from DuPont. Such sale was refused, however, until Homsy executed a document in which he provided assurances to DuPont that all medical applications of PTFE would be in accordance with FDA regulations. By letter dated March 13, 1967, DuPont first sought such assurances from Methodist Hospital, with which Homsy was then associated, and informed the hospital that its fluorocarbon resins were manufactured and sold for industrial use only, and that there were reports in the medical literature indicating serious problems inherent in the use of plastics generally and PTFE, spe-

---

3. There appears to be no dispute between the parties that Pennsylvania law is here applicable to plaintiffs' claims, since they are Pennsylvania residents and all medical treatments related to Kalinowski's TMJ problems, including initial implantation of the subject prosthesis, were rendered in Pennsylvania.

cifically, in surgical applications. (*Id.*, Exh. C–10).

Homsy wrote back to DuPont to give it the assurances sought, and therein noted that the problems with PTFE reported in the medical literature arose from the failure of the reporting physicians to properly prepare and handle the PTFE for medical/surgical use. (*Id.*, Exh. C–11).

Further, by letter and enclosed Policy Statement dated May 13, 1977, DuPont informed Vitek that its products were tested for safety in industrial uses only, that no medical grade of PTFE existed and that DuPont could not guarantee that the composition of its resins would remain constant such as to make them suitable for use in medical applications. (*Id.*, Exh A–1).

DuPont, at various times beginning as early as 1966, engaged in internal discussions and in discussions with Homsy and others concerning the desirability of developing medical grades of certain fibers and/or of undertaking research into medical applications of its products. (*See* Plaintiffs' Patricia and Thomas Kalinowski's Reply to Defendant DuPont's Motion for Summary Judgment, Doc. # 30, Exhs. L, M, NN, OO, QQ, RR, SS, XXX, CCCC, JJJJ, KKKK, CF, CI). The available record, however, does not indicate that any such possibilities for direct involvement in medical or surgical applications were ultimately pursued by defendant.

On November 20, 1989, DuPont notified Vitek and Homsy that it would no longer fill Vitek's orders for Teflon fluorocarbon resins because of litigation resulting from problems with Proplast. (*Id.*, Exh. TT).

Based upon the foregoing relevant and undisputed facts, we next consider the parties' arguments concerning the legal sufficiency of plaintiffs' claims in light of Pennsylvania law governing such claims.

*I. Strict Liability Claims*

■ As most recently noted in *Phillips v. A.P. Green Refractories Co.*, 630 A.2d 874 (Pa.Super.1993), when presented with claims arising under § 402A of the RESTATEMENT (SECOND) OF TORTS, it is necessary for courts applying Pennsylvania law to

determine, initially and as a matter of law, whether the product in question is "unreasonably dangerous." *See also Mackowick v. Westinghouse Electric*, 525 Pa. 52, 575 A.2d 100 (1990); *Azzarello v. Black Bros. Co., Inc.*, 480 Pa. 547, 391 A.2d 1020 (1978); *Dambacher by Dambacher v. Mallis*, 336 Pa.Super. 22, 485 A.2d 408 (1984). Such determination is to be made by weighing the utility of the product against the likelihood and seriousness of the injury claimed and the availability of precautions which might have prevented the injury in order to reach the ultimate conclusion whether, as a matter of social policy, the risk of loss is appropriately placed upon the supplier of the product. *Phillips.*

■ The obligation of the trial court in a strict liability action to determine whether the risk of loss for injuries arising from an allegedly defective product should fall on the supplier, *i.e.*, to determine whether the product is "unreasonably dangerous", was also discussed in detail by the Court of Appeals for the Third Circuit in *Griggs v. Bic Corporation*, 981 F.2d 1429 (1992). In *Griggs*, the court noted that such determination is to be made prior to permitting a jury to consider plaintiff's evidence of the specific defect alleged and whether such alleged defect was the proximate cause of injury, since a decision against the plaintiff on the threshold inquiry amounts to a judicial conclusion that the product is not defective as a matter of law.

Moreover, referring to *Azzarello*, wherein the Pennsylvania Supreme Court concluded that a product is not defective if it is "safe for its intended use" and, therefore, is defective only when it leaves the hands of the supplier "lacking any element necessary to make it safe for its intended use or possessing any feature that renders it unsafe for the intended use." 391 A.2d at 1026, 1027, the *Griggs* court held that the determination whether a product is "unreasonably dangerous" is necessarily linked to its intended use. In other words, the trial court's initial determination whether a product is defective centers on whether the product is safe for its intended use. If the court concludes that the product does not lack any element necessary to make

it safe for its intended use, then it is not "unreasonably dangerous".

In accordance with the law of Pennsylvania, therefore, we will begin our consideration of defendant's motion by determining whether, as a matter of social policy, the product(s) supplied by DuPont are "unreasonably dangerous", and therefore, whether the risk of loss from plaintiffs' alleged injuries should be placed upon the defendant.[4]

The Superior Court in *Phillips* and the Court of Appeals in *Griggs* employed somewhat different analyses in their respective considerations of this threshold question. In *Phillips*, the Pennsylvania Superior Court was confronted with a situation similar to that here involved and, therefore, specifically focused on issues such as the utility of the raw material and the feasibility of imposing strict liability upon bulk suppliers thereof. In *Griggs*, the court provided more general guidelines for the unreasonably dangerous inquiry by focusing on the intended use of the product in question. Utilizing either framework, we conclude that the product(s) supplied by DuPont cannot be considered "unreasonably dangerous" under Pennsylvania law.

### A. "Unreasonably Dangerous" Inquiry/Intended Use of the Product

The plaintiffs in *Griggs* sued Bic Corporation on behalf of one of their young children, who sustained burn injuries when their other child ignited a fire with a disposable butane lighter. Plaintiffs asserted that Bic's failure to make the ignition mechanism of the lighter childproof constituted a design defect which rendered the defendant liable for the child's injuries under Pennsylvania strict liability law.

The Court of Appeals, however, agreed with the district court that the disposable butane lighter there involved was intended for use by adults, not by children, and that plaintiffs had produced no evidence that the lighter was unsafe for use by adults. In concluding, therefore, that the product was

not "unreasonably dangerous" and affirming summary judgment for the defendant on plaintiff's strict liability claims, the court rejected plaintiff's argument that the possibility of children playing with the lighter constituted a "foreseeable" unintended use of the product, commenting that "the contention that in Pennsylvania a manufacturer has a duty in strict liability to guard against foreseeable use by unintended users in the context of the initial determination of defect" is unsupported by the relevant caselaw. *Griggs,* 981 F.2d at 1434.

Thus, the court concluded that in the initial judicial consideration whether a product is defective, the inquiry focuses entirely on the use of the product intended by the seller. Unintended use, even if foreseeable, will not render a product unreasonably dangerous, and, therefore, defective. Stated another way, the court concluded that under Pennsylvania law, the supplier of a product does not bear the risk of loss arising from an unintended use thereof, even if the unintended use, as well as the danger inherent in such unintended use, are foreseeable.

■ Although we are here dealing with a failure to warn rather than a design defect claim, we conclude that the principles enunciated in *Griggs* are equally applicable in this context. Under Pennsylvania law, adequate warnings are considered an element necessary to make a product safe for its intended use. *Berkebile v. Brantly Helicopter Corp.,* 462 Pa. 83, 337 A.2d 893 (1975). Sellers are, therefore, required to warn purchasers of latent dangers and limitations inherent in their products. *Id.* It follows that if such dangers or limitations are not inherent in the intended use of the product, it is not "unreasonably dangerous" if unaccompanied by warnings concerning unintended use of the product.

Applying the *Griggs* test to the undisputed facts of this case, we must determine whether the PTFE and/or FEP sold by DuPont was safe for its intended use absent warnings

---

4. We conclude that, for all purposes related to the instant motion, it is unnecessary to resolve the question whether DuPont, directly or indirectly, supplied the FEP which was also incorporated into the subject TMJ prosthesis since the relevant legal principles apply to all of the raw materials and suppliers thereof.

to the ultimate consumers of medical devices incorporating such products. It is clear that the intended use of DuPont's Teflon, in whatever form, did not extend to medical applications. The record discloses that DuPont consistently informed those purchasers who expressed an interest in using Teflon products for medical devices that its fluorocarbon resins were intended for industrial uses only. Although DuPont may have known that certain purchasers would put its products to an unintended medical use, such "foreseeability" does not negate the fact that nothing in the record indicates that the Teflon product(s) sold by defendant were unsafe for industrial use as explicitly intended by DuPont. Ultimate consumers in whom medical applications of the DuPont product(s) were implanted are, in that context, unintended users of the Teflon.

Consequently, under *Griggs*, we conclude that the risk of loss from the unintended use of the Teflon supplied by DuPont, in whatever form, is not appropriately placed upon defendant as a matter of social policy. In accordance with the *Azzarello* test, the product did not leave defendant lacking any element necessary to make it safe for its intended use or containing any element making it unsafe for its intended use. There is no evidence to indicate that either the manufacturers of industrial or household products containing Teflon or the ultimate consumers of Teflon products not implanted in their bodies are at risk of injury. Thus, there is no need for the raw material of which such products are made to be accompanied by warnings since there appears to be no danger inherent in the intended use of such material. The Teflon product(s) supplied by defendant was not, therefore, "unreasonably dangerous" under Pennsylvania law because it was not accompanied by warnings to the ultimate consumers of implantable medical devices containing Teflon product(s). Such warnings were not necessary to make defendant's product(s) safe for the intended use thereof.

B. *"Unreasonably Dangerous" Inquiry/Product Characteristics*

■ In *Phillips v. A.P. Green*, certain plaintiffs won verdicts against bulk suppliers of silica sand for injuries allegedly sustained by working with the silica at the Johnstown Works of U.S. Steel. The Superior Court held that the strict liability claims should not have been submitted to the jury in that, *inter alia*, the required social policy analysis compelled the conclusion that the product in question was not "unreasonably dangerous", and, therefore, summary judgments or directed verdicts should have been granted to all defendants ultimately held liable for plaintiffs' injuries.

In reaching that conclusion, the court first considered the utility of the product and noted that, although there are unavoidable dangers inherent in exposure to silica, there is no suitable safer alternative available. Further, the court noted that imposing upon the silica suppliers the duty to warn the steelworkers of the hazards of using that material and/or assuring that the workers took appropriate precautions to handle the silica safely would be unduly burdensome and expensive. Thus, the court concluded that social policy considerations militated against placing the risk of loss from silica exposure upon the bulk suppliers thereof, and, therefore, concluded that the product was not "unreasonably dangerous".

An analysis of the strict liability claims in this action in terms of the product characteristics and general social policy considerations enumerated in *Phillips* here leads to the identical result as that reached by the Superior Court in *Phillips, i.e.,* the product in question is not "unreasonably dangerous".

In the first instance, unlike the silica in *Phillips*, the Teflon sold by DuPont is not inherently and unavoidably dangerous in itself, or, indeed, even when used in some medical applications. There is no evidence, *e.g.,* that Proplast implants cause problems similar to those allegedly experienced by plaintiff in this case when not used in a load-bearing joint.

Moreover, when medical devices incorporating Teflon products were ultimately marketed, medical use of such products had been permitted by the FDA. Finally, when Du-Pont knew of possible medical/surgical uses of its products, it notified the raw material

purchasers of the potential dangers of using the product in that fashion as reported in the medical literature of which it was aware. Under these circumstances, it is neither feasible nor sound social policy to impose upon DuPont the risk of loss from potential injury to ultimate consumers arising from medical applications of its products.

Consequently, we conclude that all approaches to the question whether DuPont's Teflon products are unreasonably dangerous under the circumstances leads to the same answer: As a matter of social policy, DuPont is not subject to strict liability based upon its sale of PTFE and/or other Teflon products for use in medical devices. On this basis alone, defendant is entitled to summary judgment on plaintiffs' strict liability claim.

## C. Scope of Defendant's Strict Liability Duty to Warn

■ Another approach to determining whether, under the circumstances here involved, defendant is subject to liability for failing to warn either physicians or ultimate consumers of potential dangers inherent in medical applications of its industrial product(s) is to examine directly the extent of the § 402A duty to supply a safe product.

This issue has been addressed by the Pennsylvania courts in the context of supplying prescription drugs in *Coyle v. Richardson–Merrell, Inc.*, 526 Pa. 208, 584 A.2d 1383 (1991) and in *White v. Weiner*, 386 Pa.Super. 111, 562 A.2d 378 (1989). Most recently, the issue was also explored in *Phillips v. A.P. Green Refractories* in the general context of supplying industrial materials to an intermediate manufacturer.

In *Coyle* and *White* the Pennsylvania courts specifically examined the § 402A common law duty of pharmacists dispensing prescription drugs and of suppliers of component chemicals thereof to warn consumers of possible side effects of the drugs.

As noted in *Coyle*, the law of Pennsylvania imposes strict, not absolute, liability upon sellers of products which ultimately cause injury. Thus, the determination whether a supplier is subject to liability is affected by policy considerations beyond simply shifting

the potential cost of liability from injured plaintiffs to large defendants. In delineating the scope of the duties appropriately imposed under § 402A, the courts must look to the relationship between plaintiff and defendant and how directly the defendant's conduct impacts the plaintiff's injury.

In light of such considerations, both the Superior Court in *White* and the Supreme Court in *Coyle* concluded that imposing a strict liability duty to warn upon remote suppliers in the prescription drug distribution chain does not advance the purpose of the strict liability rule. Because of government regulations involved in preparing and marketing such products, as well as the inability of consumers to obtain prescription drugs absent the mediation of a physician, the Pennsylvania courts held that the obligation to protect the ultimate consumers from hazards associated with the use of the drugs does not extend to a bulk supplier of chemicals used to make prescription drugs, or to the pharmacist who sold the drug.

In so holding, both the Superior Court in *White* and the Supreme Court in *Coyle* emphasized the role of the prescribing physician in assuring that a given drug is appropriate for both the patient and the ailment to be treated and noted that the manufacturer of the drug and the medical community are in better positions than either a bulk supplier of component chemicals or a pharmacist to assure that effective warnings to the ultimate consumer are developed and communicated.

We conclude that defendant's position in this case as a bulk supplier of a raw material incorporated into a medical device is analogous to the role of a bulk supplier of a component chemical incorporated into a prescription drug. Here, as in *White*, we are evaluating the responsibility of a supplier whose product reaches the ultimate consumer only (1) after passing through the hands of a manufacturer which actually fabricated the medical device in which it was incorporated; (2) after such device was subjected to extensive experimentation and testing; (3) after a government-mandated regulatory review of the device before it was made available to physicians, who then bore the ultimate responsibility for determining its appropriate-

ness for the patient and the ailment. Hence, the rationale underlying the *Coyle* and *White* decisions is likewise applicable to the present situation. Thus, we reach the same conclusion concerning the applicability of § 402A to the defendant in this context.

Despite plaintiffs' arguments that the lesser effectiveness of the review process for medical devices, as well as DuPont's knowledge of both the hazards of medical applications of Teflon products and of Vitek's purported failure to convey effective warnings to physicians support imposition upon defendant of a strict liability duty to warn, it is nevertheless clear from the record that defendant was not in a better position than either the manufacturer of the device or the doctor who performed the surgery to assess and warn of potential hazards in the finished product.

Although there is evidence which establishes that DuPont was aware of reports of certain adverse reactions of the human body to implanted Teflon from early experimentation with such materials, there is likewise evidence which suggests that later refinements to biomedical products incorporating Teflon overcame the early difficulties, prior to still later medical writings which appear to confirm the earliest reports that devices incorporating Teflon products are not appropriate for use as replacements for load-bearing joints. To impose upon defendant the obligation to keep abreast of medical literature relating to use of its raw materials in medical devices and, in addition, to determine which of often conflicting views to accept in order to discharge a broad duty under § 402A to warn of possible hazards inherent in very specific applications of its product would place an undue burden on DuPont when there are other parties much more directly involved in furnishing to consumers the actual medical device in question.

### D. "Sophisticated User Doctrine"

In *Phillips v. A.P. Green,* the Superior Court explored the question of a bulk supplier's duty to ultimate users of the product from another vantage. There the court assumed the existence of a strict liability duty and determined, as a matter of law, whether such duty had been adequately discharged. It appears, however, that this approach is simply a more generalized examination of the relationship between a defendant bulk supplier and an injured remote user of the product, albeit in a new context for § 402A jurisprudence.

Although recognizing that the "Sophisticated User Doctrine" found in Comment *n* to § 388 of the RESTATEMENT (SECOND) OF TORTS generally provides a defense to a negligence claim, the Superior Court nevertheless concluded in *Phillips* that the "Sophisticated User Doctrine" can be used by bulk suppliers of raw materials as a defense to a § 402A claim, as well. The court noted that determining whether the supplier's duty to warn of hazards associated with its product was appropriately discharged involves the same essential questions in the context of both negligence and strict liability, *i.e.,* "(1) To what extent did the supplier act reasonably in communicating or failing to communicate a warning? (2) Given information supplied by the supplier, was the failure of a sophisticated user to communicate an effective warning to an employee or other ultimate user an intervening cause of injury?" 630 A.2d at 874 (quoting *Smith v. Walter C. Best, Inc.,* 927 F.2d 736, 742 (3d Cir.1990)).

■ Responding to the contention that applying the "Sophisticated User Doctrine" in a strict liability context abrogates the principle that the supplier of a product has a non-delegable duty to warn of dangers inherent in the product, the court further noted that the "Sophisticated User" defense does not absolve the bulk supplier of the duty to warn ultimate users. Rather, applying § 388 of the RESTATEMENT (SECOND) OF TORTS simply permits the court to find that such supplier discharged its duty by reasonably relying upon the intermediary to convey appropriate warnings to the ultimate users.

■ Thus, in order to determine whether a bulk supplier of a product has appropriately discharged its duty to warn ultimate users of potential dangers associated with its product by relying upon an intermediate sophisticated user, it is necessary to assess the reasonableness of the supplier's conduct under

the circumstances. In undertaking that analysis in *Phillips,* the court compared the relative abilities of the bulk supplier and the intermediary, there the employer, to convey the warnings, and assessed the level of the employer's knowledge of the hazards of silica, concluding that the employer was completely knowledgeable of the dangers of silicosis and was in the best position to both convey necessary warnings to its employees and to assure that appropriate precautions were taken.

Application of the "Sophisticated User" principles as explained in *Phillips* to the circumstances here involved likewise leads to the conclusion that DuPont's reliance upon a knowledgeable intermediary to convey appropriate warnings or to otherwise take appropriate precautions to guard against injury to ultimate consumers was reasonable. Indeed, in the instant circumstances, there were several sophisticated users standing between the raw material and the ultimate consumers. Charles Homsy, developer of both Proplast and of the TMJ implant at issue, not only provided the assurances sought by DuPont that he would comply with federal regulations concerning medical uses of the product purchased from DuPont, he also negated the warnings furnished by DuPont based upon the medical literature it had reviewed by attributing the apparent danger of PTFE in human implants to improper handling on the part of prior researchers in the area. In addition, later medical literature from other researchers and from physicians appeared to support Homsy's position that the DuPont products were safe for use as implant material if incorporated into properly designed and fabricated medical devices. Finally, the FDA, which approved the medical devices fabricated from such materials, can likewise be considered a knowledgeable intermediary on which DuPont could reasonably rely to protect ultimate consumers from potential hazards associated with such use of its products.

Thus, it is clear that the immediate purchaser of the raw material was a sophisticated user who was initially responsible for manufacturing, testing and monitoring the finished products made from the Teflon furnished by Dupont; that such purchaser, as well as other intermediaries, were in a far better position than defendant to assess, warn and guard against dangers inherent in the use of the raw material in medical devices, and that defendant, therefore, acted reasonably in relying upon the intermediate user to protect the ultimate consumer.

In summary, all of the possible approaches to the issue whether DuPont is an appropriate party upon which to impose strict liability in the context in which plaintiffs' claims arose lead to the same negative conclusion. As a supplier of a multi-use raw material as to which there is no evidence that it is unsafe for its intended use, DuPont is not subject to strict liability because the product in question was not unreasonably dangerous. Moreover, DuPont had no obligation under the law of Pennsylvania to monitor the development and testing of specialized medical applications of its Teflon product(s) or to evaluate the research and test results relating to such very specific applications in order to determine for itself whether the product should be accompanied by warnings to ultimate consumers and the nature thereof. To impose such a sweeping obligation upon the supplier of multiple industrial products with multiple uses would be tantamount to imposing upon a large corporation absolute liability for any injury remotely connected to its products simply because of its size and wealth. That result is not in accordance with the Pennsylvania law of strict liability, whether analyzed in terms of social policy or in terms of duty. Consequently, we will grant defendant's motion for summary judgment as to Count I of the complaint.

## II. Negligence

It follows from our discussion of the existence and scope of the duty owed by a bulk supplier of raw materials to the ultimate consumers of products containing such materials in the strict liability context that defendant is likewise not subject to liability on plaintiffs' negligence claims.

■ To the extent that defendant had a duty to warn of hazards in the specific use of its products of which it was aware, such duty was discharged by the warnings to the imme-

diate purchaser of the raw materials. Thereafter, defendant was justified in relying upon such sophisticated purchaser, as well as others involved in the development, testing and approval for use in the human body of the device which allegedly injured the plaintiffs to assure that it was appropriate for such use.

Moreover, as discussed in *Brantner v. Black & Decker*, 831 F.Supp. 460, 462 (W.D.Pa.1993), the existence, in general, of a duty running from defendant to plaintiffs under the law of negligence depends upon a two-part test: "(1) whether the risks of injury were foreseeable; and (2) whether the foreseeable risks were unreasonable." (Citing, *Griggs v. Bic*, 981 F.2d at 1435; *Mazzagatti v. Everingham*, 512 Pa. 266, 516 A.2d 672 (1986)). The essential question with respect to the existence of a duty to plaintiffs on the part of defendant, therefore, is whether DuPont's actions in furnishing its Teflon product(s) to the immediate purchaser for ultimate use in the prosthesis later implanted into Patricia Kalinowski were "*unreasonable* or expose[d] the plaintiff to an elevated risk of *foreseeable* harm." *Brantner*, 831 F.Supp. at 462 (quoting, *Mohler v. Jeke*, 407 Pa.Super. 478, 595 A.2d 1247, 1252 (1991)). (Emphasis in original.)

As noted in our consideration of the applicability of the "Sophisticated User Doctrine", defendant's conduct in supplying its product(s) to the intermediate purchaser without warnings to potential ultimate consumers of medical devices to be fashioned from such product(s) was not unreasonable as a matter of law given the ensuing process of development of the finished products incorporating such material(s), as well the testing and review thereof in both the medical community and through the regulatory process.

In addition, we further conclude that the assurances sought by defendant and furnished by the intermediate purchaser to the effect that DuPont's products would not be used for medical applications except within the guidelines established by the FDA, as well as the aforementioned development and additional testing processes of which DuPont was aware, effectively eliminated any question concerning foreseeability on the part of defendant that ultimate consumers of medical devices incorporating its product(s) might be exposed to an elevated risk of harm. Defendant disclosed to the immediate purchaser what it knew concerning the suitability of its industrial product(s) for use in implantable medical devices and thereafter reasonably relied upon the explicit assurances of such purchasers to provide for the safety of the finished products. Under such circumstances, the question of foreseeability to the defendant of an enhanced risk to ultimate consumers would inevitably be transformed into the question whether DuPont was required to anticipate a breach of duty on the part of the various intermediaries standing between itself and the ultimate consumers. We conclude that imposing upon defendant the obligation to guard against the negligent or intentional conduct of such intermediaries because of the possibility that its products could cause harm as the result of such conduct would permit the imposition of virtually limitless liability. Such a broad concept of foreseeability would mean that any entity, no matter how remotely connected to the chain of circumstances leading to injury, would be potentially liable for failing to accurately predict the vagaries of the conduct of others over which it can exert no control.

Hence, our consideration of the question of defendant's duty to guard against harm to plaintiffs from potential uses of its product(s) with respect to plaintiffs' negligence claims leads to the same conclusion reached with respect to the strict liability claims: whether approached from the standpoint of existence of a duty at all or from the standpoint whether any possible duty was adequately discharged, defendant is not subject to liability in negligence as a result of its sale of Teflon product(s) which ultimately might have been incorporated into a device which allegedly caused injury to the plaintiffs. Thus, defendant is entitled to summary judgment on Count IV of the complaint as well as on Count I.

### III. Breach of Warranties/Misrepresentation Claims

The elements of a claim for breach of implied warranty were set forth recently in

*Brantner v. Black & Decker,* 831 F.Supp. at 461:

> To establish the existence of an implied warranty of fitness for a particular purpose, there must be evidence that (1) the seller had reason to know of the particular purpose for which the buyer is purchasing the product and (2) the seller knows that the buyer is relying on its skill and judgment to furnish the proper good.

■ It is clear that plaintiffs cannot adduce evidence in support of either element of a claim for breach of implied warranty for a particular purpose, and, indeed, have not done so. In the first instance, there is no direct buyer-seller relationship between plaintiffs and defendant. Defendant had no reason to know that any of its product(s) would be incorporated into a TMJ implant ultimately "purchased" by plaintiff Patricia Kalinowski. Moreover, assuming that defendant's general knowledge that product(s) sold to Vitek and/or other prosthesis fabricators might eventually be implanted in the human body is sufficient to satisfy the first element of a claim for breach of implied warranty, it is nevertheless certain that plaintiffs have proferred no evidence that Patricia Kalinowski knew that the prosthesis she received included DuPont product(s), much less that she relied upon DuPont's expertise to assure that the raw material it supplied was appropriate for use in such a device.[5]

In addition, there is absolutely no evidence that DuPont ever expressly warranted that any of its industrial products marketed as Teflon were suitable for medical applications. Indeed, the evidence establishes that, to the contrary, DuPont repeatedly notified purchasers seeking Teflon for such purpose that it could make no representations as to the purity, consistency or appropriateness of the products for that use. Finally, as noted in connection with the claim for breach of implied warranty, there is likewise no evidence that plaintiffs ever knew of or relied upon any representations of DuPont concerning use of its products in medical applications.

■ Plaintiffs' misrepresentation claims also fail for lack of evidence of any knowledge on the part of plaintiffs concerning defendant's claims for its products in medical applications, as well as the unrefuted evidence that defendant, in fact, affirmatively disclaimed the fitness of its product(s) for medical uses. Even if we assume, as plaintiffs suggest, that DuPont was actually touting such uses for Teflon behind the scenes, there is still no evidence that either plaintiffs or other intermediaries responsible for the development and testing of the medical devices incorporating Teflon relied upon any representation of DuPont. The available evidence suggests only that Homsy, as well as other researchers in the field, developed and relied upon their own knowledge and expertise in selecting materials and fabricating the medical devices in which Teflon was used. No reasonable inference to the contrary is possible from the documents supplied by plaintiffs in an attempt to refute that conclusion. At best, permitting a jury to consider the documents upon which plaintiffs rely and their innuendoes concerning the import of such documents would impermissibly invite the jury to speculate that DuPont played a greater role in the development and sale of the device which allegedly injured plaintiffs than the available evidence supports. Finally, even such ephemeral speculation falls short of establishing a causal connection between any representation of DuPont and reliance thereon by Patricia Kalinowski and/or her doctor in selecting the particular device which allegedly caused her injuries.

### IV. Summary

Having now considered all of plaintiffs' claims and having concluded that all fail for

---

**5.** In their arguments in opposition to defendant's motion for summary judgment on its warranty claims, plaintiffs seem to take the position that plaintiffs' failure or inability to discover that the incorporation of DuPont's products into the implant which allegedly caused Patricia Kalinowski's injuries actually caused the failure of the device and the resulting adverse bodily reaction which led to the alleged injuries somehow preserves the warranty claims for jury consideration. The case cited for that proposition, *Hoeflich v. William s. Merrell Co.,* 288 F.Supp. 659 (E.D.Pa.1968), dealt with the statute of limitations applicable to warranty claims, not whether plaintiff could adduce evidence to support each element of the claim. Plaintiffs' arguments, therefore, are completely inapposite to the present issue, *i.e.,* the existence of a claim for breach of warranty.

lack of legal or evidentiary support, we will grant defendant's motion for summary judgment in its entirety and will enter judgment in favor of defendant.

### *ORDER*

And now, this 10th day of January, 1994, upon consideration of defendant's motion for summary judgment, (Doc. # 22), and plaintiffs' response thereto, **IT IS HEREBY ORDERED** that the motion is **GRANTED.**

**IT IS FURTHER ORDERED** that judgment is entered in favor of the defendant and against the plaintiffs.

**IT IS FURTHER ORDERED** that any remaining motions are **DISMISSED as moot** and that the Clerk shall mark the above-captioned action **CLOSED** for statistical purposes.