**In re: TMJ IMPLANTS PRODUCTS LIABILITY LITIGATION.**

**This Document Relates To All Actions.**

**No. 94–MD–1001.**

United States District Court,
D. Minnesota,
Third Division.

Jan. 17, 1995.

MAGNUSON, Chief Judge.

## I. INTRODUCTION

These matters, which are consolidated for pretrial purposes under 28 U.S.C. § 1407, are before the Court upon early Motions for Summary Judgment by Defendants[1] E.I. du Pont de Nemours & Company (DuPont) and American Durafilm Company, Inc. (American Durafilm), and upon a Motion to Dismiss, Sever and Remand by Duke University and Dr. Edward A. Dolan (Duke Defendants). For the following reasons, the Court grants DuPont and American Durafilm's Motions for Summary Judgment and grants the Duke Defendants' Motion to Dismiss, Sever and Remand as detailed below.

## II. BACKGROUND

Plaintiffs in these actions allege injuries resulting from the implantation in their temporomandibular joints (TMJ) of a device known as the Proplast® TMJ Implant or the Proplast®/Teflon® Interpositional TMJ Implant. Vitek, Inc. manufactured the implants out of polytetrafluoroethylene (PTFE) powder and fiber, fluorinated ethylene propylene (FEP) film, and other raw materials. The purpose of the implant was to replace the meniscus or articulating surface of the temporomandibular joint, which is the joint that connects the upper jaw to the lower jaw. Plaintiffs allege that the implants eventually resorbed the surrounding bone, causing pain to the recipients of the implants. Plaintiffs then underwent surgery for removal of the implants and, in some cases, maxillofacial

---

1. Not all Defendants in these actions are involved in the instant motions. For the sake of simplicity, the Court will refer to the movants as "Defendants." This term is not intended to include the Defendants who are not party to the motions addressed in this Memorandum and Order.

reconstructive surgery. They pursue recovery for their alleged injuries in these cases.

In these motions, Defendants DuPont and American Durafilm seek summary judgment. DuPont manufactured the PTFE and FEP used by Vitek to manufacture its Proplast® TMJ Implants.

Defendant American Durafilm is a distributor of a number of DuPont's products, including Teflon® FEP. It facilitated distribution to purchasers who desired to buy less Teflon® FEP than DuPont would sell directly. Plaintiffs allege that American Durafilm was one of the distributors who sold FEP film to Vitek for use in Proplast® TMJ Implants. American Durafilm did not play any role in the manufacture of FEP film nor did it alter the film in any way from the form it was in when received from DuPont.

Only one Plaintiff has named the Duke Defendants, and they are party only to that case, *Fuller v. E.I. du Pont de Nemours,* Civ. No. 3–94–190. The facts that relate to the Duke Defendants' Motion to Dismiss, Sever and Remand are set forth with the discussion of applicable law below.

Vitek is also a named Defendant in these actions. Because Vitek is currently in bankruptcy, however, it has not appeared in these proceedings.

There is no dispute that PTFE and FEP, sold by DuPont under the trademark "Teflon®," have numerous uses that are not inherently dangerous. For example, PTFE is used in bearings for jet aircraft, submarine piston rings, and most commonly as a nonstick coating for cooking pans. FEP is used in pipe lining, solar collectors, and other items. Medical device manufacturers have found applications for PTFE and FEP within the medical field, including artificial human veins, sutures, middle ear drain tubes, and maxillofacial reconstructive surgery.

Researchers first published studies regarding whether polymers such as Teflon® were appropriate for implantation in living organisms in the early 1950's. One of the experiments, conducted by Sir John Charnley, involved the use of Teflon® PTFE in the hip joints of dogs. After initial positive results, Charnley discovered that the PTFE abraded or disintegrated, and the dogs suffered serious injuries as a result of the foreign body reaction caused by the loose particles of PTFE. A later study by Dr. John Leidholt corroborated Charnley's findings, and other experiments found additional circumstances in which Teflon® had negative reactions when used as an injection for treating paralyzed vocal cords.

Dr. Charles Homsy, who earned his Doctor of Science degree in chemical engineering from the Massachusetts Institute of Technology and later founded Vitek, worked for DuPont from 1959 to 1966 as a research engineer and a regional sales representative. In 1966, Homsy proposed that DuPont undertake a project involving the development of orthopedic prostheses. His supervisor's supervisor, O.G. Youngquist, rejected this proposal, stating that he did not believe such a venture would be profitable for DuPont. He expressed particular concern over the potential liability that might result from such a project. Youngquist added that perhaps the best thing for Homsy to do might be to encourage DuPont's customers to consider development in that area.

In May of 1966, Homsy left DuPont and went to work for the Baylor University School of Medicine and the Methodist Hospital at the Texas Medical Center in Houston, Texas. Two years later, he invented the spongy and porous biomaterial Proplast® using PTFE particulate resin, PTFE resin fibers, carbon fibers, and sodium chloride. He patented the eight-step process used to manufacture Proplast®. In that process, the Teflon® PTFE lost its well-known mechanical and physical qualities of having a slippery, nonstick surface, but it maintained its original chemical composition. Homsy incorporated Vitek to develop and market Proplast® and related products.

A consultant to Vitek, Dr. John Kent, an oral surgeon who chaired the Department of Oral and Maxillofacial Surgery at Louisiana State University, conducted experiments in the 1970's to study the use of a Proplast® implant material. He formed the material by fusing together the Proplast® and FEP film purchased from distributors.

During this time, DuPont became aware that Vitek was exploring medical applications of DuPont's Teflon® products. DuPont sent a letter to Vitek that stated as follows:

DuPont Teflon® fluorocarbon resins . . . are made for industrial purposes only. We conduct such tests as are needed to protect the ordinary users of these products but do not perform the detailed, long-term studies which should be made before they are used for medical or surgical purposes. We make no medical or surgical grades and have not sought or received any rulings from the Federal Food and Drug Administration or from any governmental agency as to the safety or effectiveness of these products for such purposes.

Persons proposing to evaluate or to use these products for medical or surgical purposes must rely on their own medical and legal judgment without any representation on our part. They must accept full responsibility for all consequences, either direct or indirect.

At DuPont's request, Dr. Homsy, as President of Vitek, signed this disclaimer and returned it to DuPont.

This was not the first disclaimer DuPont had issued to Homsy. When he initially began working with DuPont fluorocarbon resins at the Methodist Hospital in Houston, DuPont sent a similar disclaimer to C. Gonzalez, the purchasing agent at the hospital, with a copy to Homsy. That letter informed Gonzalez and Homsy that DuPont was "reluctant to encourage the use of 'Teflon' for surgical purposes." It also pointed out the findings in the Charnley study and other studies that showed some negative reactions associated with *in vivo* use of PTFE. Homsy wrote a letter in response, relating to DuPont that he was aware of these reports, but that they were not conclusive in establishing the full potential of implants involving PTFE or other polymers produced by DuPont. In addition, Homsy mentioned that he planned to meet with Charnley in the near future to discuss his findings.

After many years of working with Proplast®, Dr. Kent determined in 1982 that the Proplast® implant material was a success. Upon Kent's advice, Homsy and Vitek developed the Proplast®/Tefon® TMJ Interpositional Implant. The implant material was Proplast® on one surface and laminated with FEP film on the other surface. Doctors were to place the Proplast® side of the implant so that it would eventually be secured by tissue growth and place the FEP film side of the device next to the lower jaw.

In 1983, the Food and Drug Administration (FDA) granted Vitek permission to sell its Proplast® TMJ Interpositional Implant under § 510k of the Food, Drug and Cosmetic Act, which permits the sale of items that are substantially equivalent to other items that have been approved. Vitek sold its product under the name "Proplast®/Teflon® Implant" or "PT Implant." In accordance with federal law, Vitek included package inserts with the implants that warned of the risks associated with the implants.

One year later, Vitek's Proplast® TMJ Implant became the focus of the American Association of Maxillofacial Surgeons 1984 Clinical Congress. Michael Bernhardt, an employee at DuPont's Central Research Department who was studying the potential market for DuPont products for use in the temporomandibular joint, attended the conference. Bernhardt took notes on information he acquired at the conference, including some information regarding the use of Proplast® in human implants.

For a brief period in 1985 and 1986, DuPont and Vitek discussed the possibility of undertaking a joint venture. There is no evidence that DuPont ever entered into such a relationship with Vitek, however. Plaintiffs make much of their Exhibit # 39, a secrecy agreement signed by Vitek and DuPont in 1980. Nothing in that agreement indicates that it pertains to TMJ implants. In fact, DuPont has submitted a letter that reveals that the agreement related to an entirely different type of product with no medical applications. All of the evidence supports the conclusion that Vitek and DuPont had a typical relationship between a raw material supplier and a finished product manufacturer.

## III. DISCUSSION

■ A transferee court has authority to enter dispositive orders terminating cases transferred under 28 U.S.C. § 1407. *In re Donald J. Trump Casino Sec. Litig.*, 7 F.3d 357, 364–68 (3rd Cir.1993), *cert. denied*, — U.S. —, 114 S.Ct. 1219, 127 L.Ed.2d 565 (1994). In analyzing questions of federal law, the transferee court should give "close consideration" to the law of the transferor court, but should apply the law as it has been interpreted by the transferee circuit court. *In re Korean Air Lines Disaster*, 829 F.2d 1171, 1176 (D.C.Cir.1987). For issues governed by state law, the transferee court must apply the state law that would have been applied if the case had not been transferred. *Id.* at 1175 ("Our system contemplates differences between different states' laws; thus a multidistrict judge asked to apply divergent state positions on a point of law would face a coherent, if sometimes difficult, task."); *see Van Dusen v. Barrack*, 376 U.S. 612, 639, 84 S.Ct. 805, 821, 11 L.Ed.2d 945 (1964).

### A. Motions for Summary Judgment

■ Summary judgment is appropriate if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Unigroup, Inc. v. O'Rourke Storage & Transfer Co.*, 980 F.2d 1217, 1219–20 (8th Cir.1992). The court determines materiality from the substantive law governing the claim. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). Disputes over facts that might affect the outcome of the lawsuit according to applicable substantive law are material. *Id.* A material fact dispute is "genuine" if the evidence is sufficient to allow a reasonable jury to return a verdict for the non-moving party. *Id.* at 248–49, 106 S.Ct. at 2510–11.

### 1. DuPont

Defendant DuPont argues three independent theories in support of its motion. First,

DuPont argues that, as a supplier of multi-use raw materials that were not inherently dangerous, it did not owe a duty to assure the safety of Vitek's product. Second, it relies on the bulk supplier/sophisticated purchaser rule. Finally, DuPont contends that it did not owe a duty of care to Plaintiffs because it sold raw materials to a medical device manufacturer that was subject to regulations of the Food and Drug Administration (FDA).[2]

In analyzing DuPont's motion, the Court has considered the law of each of the states that would apply in the individual actions. Many of those states have, either through statute or decision, adopted one of the legal defenses argued by Defendants or a variation thereof. Applying the law of those states to the undisputed facts, the Court reaches the conclusion that the Defendants DuPont and American Durafilm are entitled to judgment as a matter of law. Although the courts and legislatures of other states have not directly addressed the legal theories proposed by Defendants, the Court is convinced that the highest court of each of those states would also grant summary judgment in favor of Defendants.

■ Before turning to the specific defenses, the Court notes that the undisputed evidence demonstrates that the PTFE and FEP film used in the Vitek TMJ Implants were not "defective products." A manufacturing defect exists only where an item is substandard when compared to other identical units off of the assembly line. *Lee v. Butcher Boy*, 169 Cal.App.3d 375, 215 Cal. Rptr. 195 (1985). "A product is not defective when it is safe for normal handling and consumption...." *Duane v. Oklahoma Gas & Elec. Co.*, 833 P.2d 284, 286 (Okla.1992). Plaintiffs do not deny that PTFE and FEP are safe for a wide variety of everyday uses. They make no claim that the PTFE and FEP film that were used in the Vitek TMJ implants were somehow inferior to the typical PTFE and FEP film. Thus, the PTFE and FEP film in Plaintiffs' implants were not "defective products."

---

**2.** DuPont also contends that federal law, in particular the Medical Device Amendments (MDA), preempts Plaintiffs' claims. (DuPont Mem.Supp.

Summ. J. at 38.) Because the Court resolves these motions on other grounds, it is unnecessary to address this argument.

### a. Raw Material Supplier Defense

■ DuPont first asserts that, as a supplier of multi-use raw materials that were not inherently dangerous, it did not owe a duty to assure the safety of Vitek's product. Plaintiffs claim DuPont should be held liable because it acted as more than just an ordinary supplier of raw materials. (Pltfs.' Mem. Opp.Summ.J. at 2–3.) This claim is simply an accusation, however. Plaintiffs have failed to point to any evidence that shows DuPont acted any differently than the usual supplier of bulk materials.

The focus of cases applying the raw material supplier defense is frequently on manufacturers of component parts that are combined with other parts to make a device or machine. When the machine or device operates in a defective manner, the question arises of whether the manufacturer of the component part had a duty to warn the ultimate user or to prevent the defect in some way. Many courts have concluded that, in those circumstances, the manufacturer of the component did not have such a duty.

For example, the Eighth Circuit held that a supplier of parts was not liable in *Crossfield v. Quality Control Equip. Co.*, 1 F.3d 701 (8th Cir.1993) (applying Missouri law). There, the supplier provided a chain to a manufacturer, which then used the chain as part of a machine. *Id.* at 703. The machine malfunctioned, causing injuries to the plaintiff. The chain itself was not defective. Rather, "the dangerousness in this system came from the design of the machine, not from the chain alone. Therefore, the primary duty was owed by the designer of the machine, not the supplier of only one component part, in itself a non-defective element." *Id.* at 704. Under these circumstances, the court refused to extend liability to the supplier. To do so, the court pointed out,

> would mean that suppliers would be required to hire machine design experts to scrutinize machine systems that the supplier had no role in developing. Suppliers would be forced to provide modifications and attach warnings on machines which they never designed nor manufactured. Mere suppliers cannot be expected to

guarantee the safety of other manufacturers' machinery.

*Id.*

The Sixth Circuit expressed similar concerns in *Childress v. Gresen Mfg. Co.*, 888 F.2d 45 (6th Cir.1989) (applying Michigan law). The trial court had determined that, where a component part became "potentially dangerous in its ultimate use," the mere fact that the manufacturer of the component part had knowledge of the design of the final product was not a sufficient reason to assign responsibility to the manufacturer of the component part. *Childress*, 888 F.2d at 49. Doing so would be against public policy for at least two reasons; it would encourage the component manufacturer to remain ignorant of the final design, or, alternatively, it would force it to hire experts in each client's fields of business in order to evaluate the safety of the client's products. *Id.* The appellate court agreed with the district court's reasoning, remarking that "extending the duty to make a product safe to the manufacturer of a non-defective component part would be tantamount to charging a component part manufacturer with knowledge that is superior to that of the completed product manufacturer. The law of Michigan does not go this far." *Id.*

This concern is equally applicable in the instant case. DuPont merely supplied products that have multiple industrial uses. To impose liability upon DuPont for the uses to which those products are put would force DuPont to retain experts in a huge variety of areas in order to determine the possible risks associated with each potential use. Vitek, which specialized in the field of prosthetic devices, certainly had superior knowledge regarding the risks associated with its TMJ implants. DuPont had no specialized knowledge in that field and, in fact, specifically disclaimed such knowledge.

The *Restatement (Second) of Torts* also touches on the raw material supplier defense. Section 402A sets forth the circumstances in which a manufacturer will be held strictly liable. Comment p to that section states, "[T]he manufacturer of pigiron, which is capable of a wide variety of uses, is not so likely to be held to strict liability when it

turns out to be unsuitable for the child's tricycle into which it is finally made by a remote buyer." *Restatement (Second) of Torts* § 402A cmt. p (1965). Like pigiron, PTFE and FEP film have a number of industrial uses. To require manufacturers of such "building block" materials to guarantee the safety of their products for each and every possible use would impose an unbearable burden on those manufacturers.

The cases cited by Plaintiffs do not convince this Court that such a burden should be imposed. First, Plaintiffs rely heavily on *Little v. Liquid Air Corp.*, 952 F.2d 841, 847–48 (5th Cir.1992). The Fifth Circuit reversed that decision *en banc* on October 26, 1994, *Little v. Liquid Air Corp.*, 37 F.3d 1069 (5th Cir.1994), and therefore the prior panel decision is no longer good law.

Next, Plaintiffs cite a number of cases that are distinguishable either because the supplier designed the finished product, *Sliman v. Aluminum Co. of Am.*, 112 Idaho 277, 731 P.2d 1267, 1268 (1986), *cert. denied*, 486 U.S. 1031, 108 S.Ct. 2013, 100 L.Ed.2d 601 (1988) (manufacturer designed bottle cap), or because the raw material was inherently dangerous regardless of how it was used. *See, e.g., Bryant v. Technical Research Co.*, 654 F.2d 1337 (9th Cir.1981) (chemical caused degenerative nerve disease). Unlike the products in those cases, the products supplied by DuPont and American Durafilm have a number of safe uses.

Plaintiffs also rely on *Suchomajcz v. Hummel Chem. Co.*, 524 F.2d 19 (3d Cir.1975) (applying Pennsylvania law), which held that a manufacturer that knew its chemicals were going to be used by a purchaser to build illegal fireworks kits was liable for injuries caused by those kits. This case is not persuasive authority on the issues at hand, however. The decision in *Suchomajcz* is closely tied to the unique facts of that case, which involved the sale of a product that was illegal and prohibited by a court injunction. As the

court pointed out, "[T]he social utility of knowingly selling chemicals for illegal use is minimal; the social consequences of such sales may be devastating." 524 F.2d at 25. In addition, subsequent decisions by the Third Circuit and Pennsylvania courts have not relied on the reasoning in *Suchomajcz*. *See Fleck v. KDI Sylvan Pools, Inc.*, 981 F.2d 107 (3d Cir.1992) (duty to warn exists only when component has a single use), *cert. denied*, —— U.S. ——, 113 S.Ct. 1645, 123 L.Ed.2d 267 (1993); *Kalinowski v. E.I. Du Pont de Nemours & Co.*, 851 F.Supp. 149 (E.D.Pa., Jan. 10, 1994) (granting summary judgment to DuPont);[3] *Baker v. E.I. du Pont de Nemours & Co.*, No. 4:CV–92–1126 (M.D.Pa., Feb. 7, 1994) (relying on *Kalinowski*).

The Pennsylvania Supreme Court, in *Jacobini v. V. & O. Press Co.*, 527 Pa. 32, 588 A.2d 476, 480 (1991), perceived "no basis for requiring the component part manufacturer, ... to investigate the use of its part, ... which by itself was inert and safe." The court added, "To recognize a potential for liability through such a chain of responsibility would carry the component part manufacturer's liability to an unwarranted and unreasonable extreme." *Id.*

In *Fleck v. KDI Sylvan Pools, Inc.*, 981 F.2d 107 (3d Cir.1992), the Third Circuit interpreted the *Jacobini* holding. It concluded that *Jacobini* applied to all generic component parts, but not to a part that was "really a separate product with a specific purpose and use." 981 F.2d at 118. Because PTFE and FEP are generic parts that can be used in numerous ways with a wide variety of devices, *Jacobini* precludes a finding of liability under Pennsylvania law.

Other cases have also followed this line of reasoning. For example, the Second Circuit in *LaMontagne v. E.I. du Pont de Nemours*, 41 F.3d 846, 856–858 (2nd Cir.1994), looked to *Jacobini, Fleck, Childress,* and *Crossfield*

---

3. A number of courts have rendered decisions in cases involving claims related to Vitek's TMJ implants. Plaintiffs argue that the Court should not consider those rulings because Plaintiffs have presented different facts in these consolidated actions than were before the other courts. Although the Court considers only the undisputed facts that are currently before it, the Court does not deem it necessary to turn a blind eye to the legal analysis in other cases involving TMJ implants. Such analysis often offers a persuasive interpretation of the law that is not dependent upon a particular set of facts.

and determined that Connecticut would likewise adopt the raw material supplier defense.

In *Hill v. Wilmington Chem. Corp.*, 279 Minn. 336, 156 N.W.2d 898 (1968), Shell provided a solvent known as Sol B to Wilmington, who combined the solvent with other ingredients, packaged it, and sold it. The court's description of the facts and the law is directly on point with the instant motions:

> This is not a case where a manufacturer of a product, through an intermediary, places the finished product upon the market. It sold its product to Wilmington who, in turn, manufactured a finished product—with Shell's product as only an ingredient—and placed the finished product on the market. Shell had no opportunity or duty to warn the ultimate consumer. It neither packaged nor placed the product on the market. Wilmington prepared the label on the package giving warning as to the proper use of the product. Shell's duty was to inform Wilmington of dangers inherent in the use of Sol B not known to Wilmington. If Wilmington had adequate knowledge of the dangerous propensities of the product sold by Shell, no further duty rested on Shell to give an additional warning.

156 N.W.2d at 903. DuPont, like Shell, merely supplied ingredients. It was Vitek that produced the finished product purchased by Plaintiffs. Reasonable minds could not differ as to the fact that Vitek had superior knowledge of the risks associated with the use of DuPont's PTFE and FEP in TMJ implants, and therefore the duty to warn of any risks associated with the implants falls upon Vitek.

> Liability on the part of [the supplier of the ingredient], if there is any, must rest on its superior knowledge of the dangerous propensities of the product it supplied to [the intermediary] with knowledge of the use to which it was to be put. Inasmuch as the evidence is conclusive that [the intermediary] already had such knowledge, there would be no legal obligation on the part of [the supplier] to furnish that knowledge.

*Id.* at 904.

Applying North Carolina law, another court recently permitted the raw material supplier defense in *Travelers Ins. Co. v. Chrysler Corp.*, 845 F.Supp. 1122, 1126 (M.D.N.C.1994). The court concluded, agreeing with the principles set forth in *Childress v. Gresen Mfg. Co.*, 888 F.2d 45 (6th Cir.1989), that a mere manufacturer of a component part has no duty to inspect a completed design. *Id.*

The raw material supplier rule has also barred liability in cases involving the law of Oklahoma. In *Mayberry v. Akron Rubber Mach. Corp.*, 483 F.Supp. 407 (N.D.Okla. 1979), the court held, "Where a supplier furnishes a component part free of defects and without knowledge of the design of the end product, strict liability should not be imposed on the supplier for injury resulting from the end product design." 483 F.Supp. at 413.

California courts have applied the raw material supplier rule as well. *See, e.g., Lee v. Butcher Boy*, 169 Cal.App.3d 375, 215 Cal. Rptr. 195 (1985); *Walker v. Stauffer Chem. Corp.*, 19 Cal.App.3d 669, 96 Cal.Rptr. 803, 805–06 (1971). Plaintiffs have submitted an order, which was entered by a California trial court on November 23, 1994 in the *Breast Implant Cases.* as authority in opposition to DuPont's motion. That opinion is not on point, however. It expressly recognized the raw material supplier defense as the law in California, but held that Dow was more than just a raw material supplier. Dow instead "represented its silicone gel components to be fully tested and told its customers that they did not need to test or inspect, as Dow had already done it for them." *Breast Implant Cases*, JCCP No. 2754–0000, slip op. at 1–3 (Cal.Super.Ct. Nov. 23, 1994). Dow's products were sold as part of a "system." *Id.* at 3. These facts are distinguishable from the instant case, where DuPont explicitly disclaimed the suitability of PTFE and FEP film for use in medical applications and where those products were truly multi-use components as opposed to a system designed for the formulation of a particular type of product.

Although Hawaiian courts have not directly spoken to the raw material supplier defense, it was followed in *Kealoha v. E.I. Du*

*Pont de Nemours & Co.*, 844 F.Supp. 590, 594–95 (D.Haw.1994). The court found that

> [a] rule that places liability for a defective product on the finished product manufacturer and not the bulk supplier of inherently safe raw materials is not only supported by the weight of authority in other jurisdictions, but accords with common sense and the general principles underlying strict products liability law in Hawaii.

844 F.Supp. at 594. The court also correctly pointed out that this determination precluded liability under both negligence and strict liability. *Id.*

New Jersey's Superior Court touched on the raw material supplier defense in *De Primo v. Lehn & Fink Prods. Co.*, 223 N.J.Super. 265, 538 A.2d 461, 464 (Law Div.1987). The defense was not directly applicable to that case, but the court noted that the reasoning in cases following that rule suggested that summary judgment was appropriate upon the facts before the court. This Court is convinced that, faced with the facts of the instant case, the courts of New Jersey would hold that the raw material supplier doctrine bars recovery by Plaintiffs.

With the exception of the *Suchomajcz* case discussed above, Plaintiffs have cited no case involving multi-use materials that were not inherently dangerous in which the raw material supplier defense was rejected. Based on the great weight of authority adopting the rule, the Court believes that the raw material supplier doctrine would be followed in every jurisdiction. Accordingly, the Court concludes that DuPont is entitled to summary judgment on all claims.

### b. Bulk Supplier/Sophisticated Purchaser Rule

■ Although the Court need not reach the other issues raised as defenses by DuPont, examination of those issues may provide useful should those questions be raised on appeal. For this reason, the Court turns to DuPont's second defense, the bulk supplier/sophisticated purchaser rule.

Several states have adopted § 388 of the *Restatement (Second) of Torts*. That section provides as follows:

> One who supplies directly or through a third person a chattel for another to use is subject to liability to those whom the supplier should expect to use the chattel with the consent of the other or to be endangered by its probable use, for physical harm caused by the use of the chattel in the manner for which and by a person for whose use it is supplied, if the supplier
>
> (a) knows or has reason to know that the chattel is or is likely to be dangerous for the use for which it is supplied, and
>
> (b) has no reason to believe that those for whose use the chattel is supplied will realize its dangerous condition, and
>
> (c) fails to exercise reasonable care to inform them of its dangerous condition or of the facts which make it likely to be dangerous.

*Restatement (Second) of Torts* § 388 (1965). Of particular relevance in these cases is Comment n to § 388, which discusses warnings given to a third party. Where a manufacturer provides a product to an intermediary who will then sell the product to the ultimate user, the question arises of whether a warning to the intermediary will relieve the manufacturer from liability. Comment n states that a number of factors should be considered in determining whether a warning to an intermediary is sufficient. Those factors include:

> (1) the dangerous condition of the product; (2) the purpose for which the product is used; (3) the form of any warnings given, (4) the reliability of the third party as a conduit of necessary information about the product; (5) the magnitude of the risk involved; and (6) the burdens imposed on the supplier by requiring that [it] directly warn all users.

*Goodbar v. Whitehead Bros.*, 591 F.Supp. 552, 557 (W.D.Va.1984), *aff'd sub nom. Beale v. Hardy*, 769 F.2d 213 (4th Cir.1985). The fundamental principle enunciated in Comment n is that "[m]odern life would be intolerable unless one were permitted to rely to a certain extent on others' doing what they normally do, particularly if it is their duty to do so." *Restatement (Second) of Torts* § 388 cmt. n (1965).

DuPont argues that § 388 does not address the situation presented in these cases because DuPont did not "suppl[y] directly or through a third person a chattel for [plaintiffs] to use," as is stated in § 388. Instead, DuPont provided a raw material, which Vitek then converted into an entirely new product. DuPont asserts that § 388 better applies to circumstances involving a manufacturer and mere distributor. (DuPont's Mem. Supp. Summ. J. at 24 n. 18.)

There is some authority in support of DuPont's position. *See Veil v. Vitek, Inc.,* 803 F.Supp. 229, 233 (D.N.D.1992) (bulk supplier of raw material not "supplier of chattels" within meaning of § 388). Nevertheless, because some states might find § 388 applicable, the Court will discuss Defendants' potential liability under that section.

A balancing of the factors described in Comment n leads the Court to determine that the undisputed facts establish that DuPont acted reasonably in relying on Vitek to communicate warnings to the Plaintiffs. First, DuPont informed Vitek that its fluorocarbon resins were intended for industrial purposes only and that it did not conduct sufficient testing to determine whether medical and surgical uses should be recommended. DuPont required Vitek to sign a disclaimer recognizing that DuPont made no claims as to the appropriateness of its products for medical and surgical uses and that Vitek must rely on its own medical and legal judgment if it chose to use DuPont's products for those purposes. DuPont had also issued other disclaimers to Dr. Homsy and provided him with information regarding the Charnley studies and other research regarding medical uses of PTFE and FEP. Dr. Homsy replied that he was aware of the studies and that they were not conclusive. DuPont thus warned Vitek to the full extent it could of the risks associated with using PTFE and FEP.

In addition, Vitek was required by federal law to provide warnings with its finished product. DuPont reasonably expected that Vitek would comply with the intricate federal regulations of medical devices.

Finally, the burden that would be imposed on DuPont if it were required to warn the ultimate users of the implants would be extreme. There is no feasible method of affixing a warning to the PTFE and FEP in such a way that the warning would remain intact until reaching the recipient of the implant. Plaintiffs propose that DuPont should have provided some sort of insert to include with the packaging of the implants. Such an insert would have little efficacy, however, given the fact that Vitek was already required to provide such warnings.

In sum, when the Court considers all of the factors delineated in Comment n to § 388, it concludes that no genuine issue of material fact exists as to whether DuPont exercised reasonable care in warning only Vitek and not the Plaintiffs. This holding is further supported by the fact that Vitek was in a position to discover for itself all dangers that would be associated with the use of PTFE and FEP in its implants. "[W]hen the supplier has reason to believe that the purchaser of the product will recognize the dangers associated with the product, no warnings are mandated." *Goodbar v. White-head Bros.,* 591 F.Supp. 552, 561 (W.D.Va. 1984), *aff'd sub nom. Beale v. Hardy,* 769 F.2d 213 (4th Cir.1985).

Courts have described this basic analysis as the "sophisticated purchaser" rule, the "learned intermediary" rule, or the "bulk supplier" rule. Although there may be shades of difference between these rules as they are applied by courts, the fundamental tenet is that a manufacturer should be allowed to rely upon certain knowledgeable individuals to whom it sells a product to convey to the ultimate users warnings regarding any dangers associated with the product. The principle was succinctly described in *American Law of Products Liability 3d* as follows: "Bulk suppliers of products to manufacturers, who are sophisticated users, have no duty in negligence, strict liability, or breach of warranty to warn ultimate purchasers of the manufacturer's product." *American Law of Products Liability 3d* § 5.23 (Matthew J. Canavan, ed. 1994).

Plaintiffs in these actions argue that Vitek was not a sophisticated purchaser. They have failed to raise a genuine issue of materi-

al fact on this point, however. It is undisputed that Dr. Homsy, the President of Vitek, earned a Doctor of Science degree in chemical engineering from one of the leading educational institutions in the nation. He worked as the Director of the Prosthesis Research Laboratory at the Methodist Hospital in Houston and as a consultant to Dr. Michael DeBakey in conjunction with the Rice–Baylor Artificial Heart Project. While at the Methodist Hospital, he patented the biomaterial Proplast®. Dr. Homsy published more than fifty articles about artificial implants and has made numerous presentations regarding his work with artificial materials in the human body to students, physicians and dentists. As a member of the Baylor College of Medicine faculty, Dr. Homsy created the first curriculum in biomechanics and biomaterials for use in training surgeons. Based on these accomplishments by Dr. Homsy, the President of Vitek, reasonable minds could not differ as to the conclusion that Vitek was a "sophisticated purchaser" as that term has been applied in this area of the law.

Decisions applying the law of several states indicate that, under the bulk supplier/sophisticated purchaser theory, DuPont is entitled to summary judgment. Although the Court will not here attempt to provide an exhaustive description of the law in each state, a brief survey of cases applying the "sophisticated purchaser" approach and variations thereof may be useful.

The Supreme Court of Alabama agreed with Comment n to § 388 in *Purvis v. PPG Indus., Inc.,* 502 So.2d 714, 720 (Ala.1987): "Where the third party has an independent duty to warn the ultimate user, such as that imposed by a vendor/vendee relationship (section 388 of the Restatement), the manufacturer is justified in relying upon the third party to perform its duty."[4] Reliance on a third party should be permitted if the manufacturer has a reasonable basis to believe that the third party will pass on the relevant warnings to the ultimate user. *Id.* at 722.

Facts analogous to those before the Court were present in *Shell Oil Co. v. Harrison,* 425 So.2d 67 (Fla.Dist.Ct.App.1982). In that case, a bulk manufacturer supplied chemicals to an intermediary, who then formulated the chemicals into a soil fumigant. The court found it significant that the intermediary was required by the Environmental Protection Agency to place on the product labels containing warnings. The court reasoned that those federal regulations allocated responsibility for warnings to the formulator/intermediary rather than the bulk manufacturer of the chemicals. 425 So.2d at 70. Under Florida law, the duty of the manufacturer to warn is directed to the learned intermediary rather than the ultimate user. *See Felix v. Hoffmann–LaRoche, Inc.,* 540 So.2d 102, 104–05 (Fla.1989).

In *Exxon Corp. v. Jones,* 209 Ga.App. 373, 433 S.E.2d 350 (1993), the Georgia Court of Appeals applied the knowledgeable intermediary doctrine. Exxon, a bulk supplier, provided gas to an intermediary, who then delivered it to consumers. The gas caused an explosion. The court held that, under Georgia law, Exxon's failure to warn the consumers of the dangers associated with the gas was not the proximate cause of their injuries, and therefore Exxon was not liable to the injured individuals. 433 S.E.2d at 353.

Applying Illinois law, the Seventh Circuit in *Manning v. Ashland Oil Co.,* 721 F.2d 192 (7th Cir.1983), considered whether Ashland, a supplier of lacquer thinner, acted "reasonably in light of what it objectively knew about the party to whom it sold the lacquer thinner." 721 F.2d at 196. Ashland assumed that the "middle purchaser" had adequate labeling because the purchaser appeared knowledgeable, and Ashland did not have any notice that the product might be ambiguously labeled. *Id.* The court noted that "courts which impose a duty to learn a middleman's knowledge of a product allow the supplier to rely upon the middleman, using his knowledge or expertise, to pass on any warnings or instructions for the safe use of the product." *Id.* at 195. Other cases

---

4. Strict liability does not exist under Alabama law. Instead, Alabama courts follow an "extended manufacturer's liability doctrine." *Cook v.*

*Branick Mfg., Inc.,* 736 F.2d 1442, 1446 (11th Cir.1984).

from Illinois indicate that a manufacturer's duty to warn "will rarely extend beyond the communication of warnings to the immediate vendee, since, as a practical matter, the vendor has neither the means of controlling the vendee's subsequent actions nor the opportunity to provide warnings directly to the ultimate user." *Venus v. O'Hara,* 127 Ill.App.3d 19, 82 Ill.Dec. 143, 147, 468 N.E.2d 405, 409 (1984); *see also Cruz v. Texaco, Inc.,* 589 F.Supp. 777, 780 (S.D.Ill.1984) (where manufacturer provided winch trucks to employer and employer knew of danger and trained truck drivers, manufacturer had no duty to warn driver).

The Kansas Supreme Court was one of the first courts to adopt the bulk supplier doctrine. In *Jones v. Hittle Serv., Inc.,* 219 Kan. 627, 549 P.2d 1383,.1393 (1976), the court stated, "If the product is sold in bulk, adequate warning to the vendee is all that can reasonably be required." The court also made the point that "warning is required to impart knowledge, and if that knowledge has already been acquired, it is not necessary...." *Id.* (citations omitted). The Tenth Circuit discussed the *Jones* decision in *Mason v. Texaco, Inc.,* 862 F.2d 242 (10th Cir.1988):

> Essentially, the holding [in *Jones* ] imposes upon the bulk seller the obligation to sell only to knowledgeable and responsible distributors. *Jones* does not impose a duty on the bulk seller to warn the ultimate consumer, and specifically does not impose a duty on the bulk seller to police the adequacy of warnings given by the distributor.

862 F.2d at 246.

The Fifth Circuit recently applied the sophisticated purchaser rule in *Scallan v. Duriron Co.,* 11 F.3d 1249 (5th Cir.1994). The court held that Louisiana law imposes upon a manufacturer only a limited duty to warn a sophisticated user that a danger exists if the sophisticated user knew or should have known of the risk involved. 11 F.3d at 1252. If the risk would be obvious to the sophisticated user, then the manufacturer has no duty to warn. *Id.* In the actions at bar, the evidence demonstrates that any risk would

have been at least as obvious to Vitek as to the moving Defendants, if not more so.

In *Smith v. Walter C. Best, Inc.,* 927 F.2d 736, 742 (3d Cir.1990), the Third Circuit determined that Ohio would allow the sophisticated purchaser defense as a defense to both negligent failure to warn claims and strict liability for failure to warn. The Sixth Circuit also applied the law of Ohio in *Adams v. Union Carbide Corp.,* 737 F.2d 1453 (6th Cir.1984). In that case, the court discussed § 388 of the Restatement and Comment n. 737 F.2d at 1456–57. It held that the bulk supplier of a chemical that allegedly caused the plaintiff to suffer from a respiratory disease was entitled to rely on the plaintiff's employer, who had a duty to warn about the disease. *Id.*

The United States District Court for the District of Oregon considered the sophisticated purchaser defense in *Seifert v. Vitek, Inc.,* No. 91–479–JE (D.Or., Oct. 19, 1993). Based on its reading of Oregon law, the court decided that the sophisticated purchaser rule would be applied in Oregon. This conclusion is consistent with *Schmeiser v. Trus Joist Corp.,* 273 Or. 120, 540 P.2d 998 (1975) (where manufacturer warned contractor of danger associated with improper erection of trusses, manufacturer had no duty to warn contractor's employee), and *Phillips v. Kimwood Mach. Co.,* 269 Or. 485, 525 P.2d 1033 (1974) (question of liability depended upon whether manufacturer warned employer, not employee).

Although no South Carolina court has specifically addressed the issue, the Fourth Circuit predicted in *Coffey v. Chem. Specialties, Inc.,* 4 F.3d 984 (table), 1993 WL 318886 **3 (4th Cir. Aug. 20, 1993), that South Carolina would adopt the bulk supplier defense. "[T]he inquiry is whether the bulk supplier used reasonable care in providing the necessary warnings to a reliable intermediary." *Id.* at **5.

The Supreme Court of Tennessee specifically declined to either accept or reject the sophisticated user or learned intermediary doctrines in *Whitehead v. Dycho Co.,* 775 S.W.2d 593 (Tenn.1989). The plaintiff in *Whitehead* was injured when she took a chemical from her place of work and at-

tempted to use it at home. The chemical, which had been purchased by her employer from a manufacturer, exploded. When the plaintiff sued the manufacturer of the chemical, the court denied recovery on the grounds that there was no proximate cause; the "independent intervening act" of the plaintiff's employer "was the proximate cause of the accident." *Id.* at 599. Because the manufacturer had no reasonable access to the user and because the employer was knowledgeable and in a position to warn the plaintiff, the manufacturer was not liable. *Id.* at 600.

In 1986 the Supreme Court of Texas unequivocally adopted the bulk supplier doctrine. The court held,

> the issue is whether the supplier's reliance on the intermediary is reasonable. In determining whether a bulk supplier's duty to warn extends to ultimate users of a product, courts may consider whether the distributor is adequately trained, whether the distributor is familiar with the properties of the product and its safe use, and whether the distributor is capable of passing on its knowledge to consumers.

*Alm v. Aluminum Co. of Am.*, 717 S.W.2d 588, 592 (Tex.1986). Applying this standard to the undisputed facts in the instant case demonstrates that Defendants' reliance on Vitek was reasonable. Vitek was as well trained and knowledgeable as any other company or person in the field, as evidenced by Dr. Kent's research, Dr. Homsy's work at the Baylor School of Medicine and the Methodist Hospital at the Texas Medical Center in Houston and his development of the patented material Proplast®, and Vitek's involvement with the American Association of Maxillofacial Surgeons 1984 Clinical Congress. Vitek was also indisputably familiar with the properties of PTFE and FEP, which Vitek researchers had studied and worked with for many years. Finally, Vitek was capable of passing on any necessary warnings to its consumers along with the package inserts required by federal regulations.

When the Texas Court of Appeals later applied the bulk supplier doctrine in *Munoz v. Gulf Oil Co.*, 732 S.W.2d 62, 66 (Tex.Ct. App.1987), it observed, "In any situation in which there is a duty to warn, the warning is required in order to impart special knowledge. If that special knowledge already exists, further information is not necessary." Any special knowledge that DuPont possessed regarding the medical use of PTFE and FEP was conveyed to Vitek or already known by Vitek. Plaintiffs have failed to offer any evidence that would suggest DuPont failed to pass on any special knowledge to Vitek relevant to these cases.

In *Goodbar v. Whitehead Bros.*, 591 F.Supp. 552, 561 (W.D.Va.1984), *aff'd sub nom. Beale v. Hardy*, 769 F.2d 213 (4th Cir.1985), the court first pointed out that Virginia has not adopted the doctrine of strict liability. Then, turning to § 388 of the Restatement, the court balanced the factors set forth in Comment n and held "as a matter of law that there was a reasonable basis for Defendants . . . to rely upon [the employer of the injured plaintiff] to give appropriate information of all the hazards of working with [the product] to its employees." 591 F.Supp. at 557.

Other decisions applying Virginia law state that "[t]he duty to warn stems from the view that the manufacturer should have superior knowledge of his product." *Featherall v. Firestone Tire & Rubber Co.*, 219 Va. 949, 252 S.E.2d 358, 367 (1979). Where, as with DuPont and Vitek, the manufacturer does not have superior knowledge, there is no duty to warn. *Morsberger v. Uniking Conveyor Corp.*, 647 F.Supp. 1297, 1299 (W.D.Va. 1986).

The Supreme Court of Washington faced issues quite similar to those currently before the Court in *George v. Parke–Davis*, 107 Wash.2d 584, 733 P.2d 507 (1987), a case involving the drug DES. Plaintiffs sought to establish that the manufacturers of DES should be liable. The court was not persuaded. It noted that DES was not inherently harmful. Instead, the problem arose from the manner in which the DES was used. In addition, the court pointed out that the Food and Drug Administration requires the tablet manufacturers, not the bulk manufacturers, "to account for and warn of a drug's properties. 21 U.S.C. § 5. It would therefore be anomalous to require the raw manufacturer to conduct separate tests to determine the

adverse effects of the drug when by federal statute, the tablet manufacturer bears this responsibility." 733 P.2d at 515. Similarly, it would be anomalous to require DuPont to conduct separate tests to determine the potential risks of using PTFE and FEP film in TMJ implants when Vitek was already required to do so.

The law of West Virginia also supports Defendants' motions. Citing Comment n to § 388 of the Restatement, the Supreme Court of Appeals in *Ilosky v. Michelin Tire Corp.*, 172 W.Va. 435, 307 S.E.2d 603, 610 n. 8 (1983) stated,

> Where the ultimate user of the product claims that the 'defect' consists of a lack of adequate warnings or labels and the manufacturer can show that such warnings were given to the assembler and that the assembler utilized the component against the manufacturer's warnings, liability should fall on the assembler rather than the manufacturer.

Despite DuPont's disclaimer as to the compatibility of its products with medical uses, Vitek proceeded to use those products in its implants. Under West Virginia law, it is Vitek and not DuPont that must bear the risk of this choice. *See Rohrbough v. Wyeth Labs., Inc.*, 719 F.Supp. 470, 478 (N.D.W.Va. 1989) (learned intermediary rule barred recovery), *aff'd*, 916 F.2d 970 (4th Cir.1990).

Wisconsin has neither accepted nor rejected the bulk supplier doctrine. *Nigh v. Dow Chem. Co.*, 634 F.Supp. 1513, 1517 (W.D.Wis. 1986). Nevertheless, the United States District Court for the Western District of Wisconsin determined that a jury instruction that was based on the doctrine was appropriate. *Id.* The court was convinced that, if the Wisconsin Supreme Court were presented with the issue, it would adopt the doctrine. *Id.* Defendant had the duty to give adequate warnings "to the intermediary with the reasonable expectation that they would be passed along to the ultimate user." *Id.* Where, as in the instant case, the intermediary was adequately warned, the manufacturer may properly rely upon the bulk supplier doctrine as a bar to recovery.

In sum, under the bulk supplier doctrine, the sophisticated purchaser rule or learned intermediary rule and related principles, Defendants would be entitled to summary judgment in those cases in which the law of the following states applies: Alabama, Florida, Georgia, Illinois, Kansas, Louisiana, Ohio, Oregon, South Carolina, Tennessee, Texas, Virginia, Washington, West Virginia, and Wisconsin. The courts of these states either have adopted or would follow these rules precluding a finding of liability against DuPont. In light of the prior conclusion that the raw material supplier defense would be followed in all jurisdictions, the Court declines to reach the question of whether the law of other states would also permit the bulk supplier/sophisticated purchaser defense.

#### c. FDA Regulations

DuPont argues as a third independent theory that it did not owe a duty because it sold raw materials to an FDA-regulated medical device manufacturer. (DuPont Mem.Supp. Summ.J. at 28.) This theory is merely another variation of the theories discussed above, however. The fact that Vitek was required by FDA regulations to assure the safety of its product indicates that it was reasonable for Defendants to rely on Vitek to provide the necessary warnings. *See Restatement (Second) of Torts* § 388 cmt. n (1965).

#### d. Additional Claims Raised by Plaintiffs

In addition to claims of negligence and strict liability, Plaintiffs assert a variety of other theories against Defendants. The Court rejects each of these theories.

First, as has already been discussed, DuPont's products were not defective, and therefore any claims based on design defect lack merit.

Second, any claims of breach of warranty are wholly unsupported by the evidence. DuPont specifically informed Vitek that it did not guarantee the appropriateness of its products for medical uses. There is no claim that the PTFE and FEP film were not fit to be used for their ordinary industrial purposes.

■ Third, the Plaintiffs assert that "DuPont's acquiescence in the use of its trademark in association with Vitek's products could render it liable." (Pltfs.' Supp'l Mem. Opp. DuPont's Summ.J. at 12.) The Court knows of no case in which a party was held liable for defective products manufactured by another company merely because the other company misused a trademark belonging to the first party. To hold DuPont liable under this theory would be to stretch trademark law far outside of its intended scope.

■ Fourth, Plaintiffs allege that a "secret partnership" or "joint enterprise" existed between DuPont and Vitek. The documents that Plaintiffs rely on in support of this allegation do not show that such a relationship existed, however. There is no evidence that DuPont and Vitek joined together to earn and share profits out of the same pool. Plaintiffs agree that a "community of interest" in profits is a necessary element of a partnership. (Pltfs.' Mem.Opp.Summ.J. at 41.) The mere fact that increased sales of Vitek implants could have the secondary effect of increased sales of DuPont's PTFE and FEP does not show a "community of interest" in profits. *See, e.g., Coca–Cola Bottling Co. v. Coca–Cola Co.,* 696 F.Supp. 57, 74 (D.Del.1988) ("the common fortunes of the Company and the bottlers may ride to an extent on the demand for Coca–Cola, but this does not amount to risk-sharing of the requisite kind" to show partnership).

The Court also finds no factual or legal support for any claims of misrepresentation, concert of action, conspiracy, aiding and abetting, breach of duty to act, intentional or negligent infliction of emotional distress, medical monitoring, or state consumer protection laws. Finally, although the Plaintiffs accuse DuPont of spoliation of evidence, they have offered no concrete evidence that could lead to such a conclusion. Mere allegations are insufficient to withstand a motion for summary judgment.

### 2. American Durafilm

■ American Durafilm adopts the arguments of DuPont in support of its Motion for Summary Judgment. For the same reasons that DuPont is entitled to summary judgment on all of Plaintiffs' claims, American Durafilm is entitled to summary judgment. There are also additional reasons that support American Durafilm's motion.

One such reason was described in *American Law of Products Liability 3d* § 5.23 (Matthew J. Canavan, ed. 1994): "The general rule of liability is that a distributor, acting as a mere conduit of the product, is only liable for injuries caused by known dangers; where a product has a latent defect, there is no duty on the distributor to inspect for possibly inherent defects." Even if the Court were to accept Plaintiffs' argument that DuPont's products were defective, such defect would surely be considered latent. American Durafilm would have no duty to inspect for and warn of such defects.

Certain state statutes specify that a mere distributor of a product, which has no role in the manufacture of that product, cannot be held strictly liable. *See, e.g.,* Tenn.Code Ann. § 29–28–106(b) (1994) (no strict liability for seller unless seller is also a manufacturer); Mo.Ann.Stat. 537.762 (Vernon 1993) (permitting dismissal of seller in products liability action where manufacturer is also defendant). These statutes provide independent grounds for dismissal of Plaintiffs' claims against American Durafilm in a number of actions.

For all of these reasons, the Court grants summary judgment in favor of Defendant American Durafilm. All claims against American Durafilm are dismissed.

### B. Motion to Dismiss, Sever and Remand by Duke Defendants

Finally, the Court turns to the Duke Defendants' Motion to Dismiss, Sever and Remand. Plaintiff Patsy Sue Fuller filed her Complaint against several individuals. All of those persons, with the exception of DuPont and the Duke Defendants, were dismissed by stipulation of the parties prior to the transfer of this action to this Court. Because the Court has determined that DuPont is entitled to summary judgment on all claims, *supra,* the Duke Defendants are the only remaining Defendants in the Fuller case, Civ. No. 3–94–190. As stated above, the Duke Defendants

are not parties to any other cases in these consolidated actions.

The Duke Defendants move for dismissal of Counts I, IV through VIII, XIII through XX, XXIII(b), and XXIII(d) of Fuller's Complaint against them pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. They also move for dismissal of Counts IX, X, and XII of the Complaint pursuant to both Rule 9(b) and Rule 12(b)(6). In addition, they move to sever the remaining counts against them, Counts II, III, XI, XXI, XXIII(a), XXIII(c), and XXIV, pursuant to Rule 21. Finally, they ask this Court to recommend to the Judicial Panel on Multidistrict Litigation that the severed Counts be remanded to the transferor court, the Middle District of North Carolina, pursuant to Rule 14(c)(ii) of the Rules for Multidistrict Litigation.

■ For the purposes of the Defendants' Motion to Dismiss, the Court takes all facts alleged in Plaintiff's Complaint as true. *Westcott v. Omaha*, 901 F.2d 1486, 1488 (8th Cir.1990). Further, the Court must construe the allegations in the Complaint and reasonable inferences arising from the Complaint favorably to Plaintiff. *Morton v. Becker*, 793 F.2d 185, 187 (8th Cir.1986). A motion to dismiss will be granted only if "it appears beyond doubt that the Plaintiff can prove no set of facts which would entitle [her] to relief." *Id.; see Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 102, 2 L.Ed.2d 80 (1957). The Court applies those standards in the following discussion.

Dr. Dolan is a dentist specializing in oral and maxillofacial surgery. The Complaint alleges that Dr. Dolan implanted a TMJ implant into Fuller on April 19, 1988 and that he performed this surgery at Duke University Medical Center in North Carolina. Dr. Dolan continued to treat Fuller after her surgery. When her pain did not subside, he recommended that the TMJ implant be removed. Dr. Dolan removed the implant on May 11, 1989, at the Duke University Medical Center. The pain continued, and Dr. Dolan performed yet another surgery on July 16, 1990.

### 1. Federal Claims (Counts VIII, XIX, and XX)

Plaintiff does not oppose the dismissal of Counts VIII, XIX, and XX, the claims based on federal law. Accordingly, the Court grants the Duke Defendants' motion to dismiss those counts.

### 2. State Law Claims Other than Medical Malpractice

Although no issues of federal law remain, the Court has diversity jurisdiction over the parties in *Fuller*. The parties agree that North Carolina substantive law applies to the case, but that federal law controls on procedural questions. The Duke Defendants' motion to dismiss for failure to state a claim must be considered in conjunction with Rule 8(a) of the Federal Rules of Civil Procedure, which requires the plaintiff to set forth a "short and plain statement of the claim showing that the pleader is entitled to relief." *See* 5A Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1356 (1990). "Rule 8 only requires the pleadings in a federal court action to indicate that if the allegations in the complaint are established, the pleader is entitled to relief under the substantive law of the jurisdiction." *Id.* at § 1204.

### a. Products Liability, Breach of Warranties, and U.C.C. Claims (Counts I, IV through VII, XIII, XXIII(b), and XXIII(d))

■ The Duke Defendants first argue that, under North Carolina law, physicians and other health providers cannot be held liable under theories of products liability, breach of warranties, or other claims under the Uniform Commercial Code (U.C.C.). In *Batiste v. Am. Home Prods. Corp.*, 32 N.C.App. 1, 231 S.E.2d 269, 272–73, *cert. denied*, 292 N.C. 466, 233 S.E.2d 921 (1977), the court held that a physician who issued a prescription for an oral contraceptive drug was not a seller of goods and therefore the plaintiff's U.C.C. claims, including claims of implied warranties of fitness and merchantability, failed as a matter of law. The court stated, "We adhere to the general and majority rule that those who, for a fee, furnish their professional medical services for the guidance and assistance of others are not

liable in the absence of negligence or intentional misconduct." *Id.* Plaintiffs interpret this statement as implying that, where negligence or intentional misconduct *are* alleged, a physician could be held liable under the U.C.C. This interpretation misses the point of the holding, however. The court's remarks indicate that a plaintiff's claims based on improper medical treatment are properly grounded in the torts directly related to those claims and not in contract or the U.C.C.

In *Starnes v. Taylor,* 272 N.C. 386, 158 S.E.2d 339, 343 (1968), the North Carolina Supreme Court declared, "In the absence of proof of a contract to that effect, a surgeon or physician does not warrant a cure, or even that the patient will be in as good condition after the operation of treatment as he was prior thereto." This holding is now embodied in statute. The legislature in North Carolina has shielded health care providers from any claims based on breach of warranty as to the result of medical procedures or treatments in all cases except those where the warranty is in writing and has been signed by the provider or a representative of the provider. N.C.Gen.Stat. § 90–21.13(d). The North Carolina Court of Appeals explained the rationale behind this statute in *Preston v. Thompson,* 53 N.C.App. 290, 280 S.E.2d 780, 783, *cert. denied,* 304 N.C. 392, 285 S.E.2d 833 (N.C.1981):

> Every patient certainly enters health care treatment (including dental treatment) with hopes and expectations of satisfactory results. Because of the uncertainty inherently involved in the course of treatment, due largely to personal physical and emotional idiosyncrasies of the individual patient, it would generally be imprudent for the health care provider to guarantee a definite result. A patient understandably may be disappointed when his expectations are not fulfilled or his condition fails to improve, and seek recourse against the provider, despite the fact that every effort was expended to obtain the desired result. The legislature wisely foresaw the likelihood that these disappointed patients might believe they had been promised specific results, and chose to require that any

suit based upon such claims must be supported by written assurances.

*Preston* also reiterated the holding of *Batiste* that the transfer of a product by a physician or dentist to a patient, such as dentures, was not a "sale" of goods within the meaning of the U.C.C. *Id.* 280 S.E.2d at 784–85; *see also Cameron v. New Hanover Memorial Hosp., Inc.,* 58 N.C.App. 414, 293 S.E.2d 901, 920 (citing *Batiste* and *Preston*), *petition denied,* 307 N.C. 127, 297 S.E.2d 399 (1982).

*Batiste* also rejected the theory of products liability as a claim against a treating physician. 231 S.E.2d at 273. The mere fact that a health care professional provides a product to a patient does not make that person a "manufacturer" of that product. In addition, *Batiste* held the "chain of distribution" theory of liability was inapplicable to a health care provider. *Id.* at 272.

Other cases involving the TMJ implants have followed the general proposition that health care providers should not be held liable for claims based on products liability and warranties. *See, e.g., Brooks v. Vitek, Inc.,* 875 F.2d 499, 500–01 (5th Cir.1989) (fact that dentist fitted squares of Proplast® to fit plaintiff's TMJ did not make dentist a manufacturer; plaintiff's claims were really medical malpractice claims, not products liability claims); *Cafazzo v. Central Medical Health Servs., Inc.,* 430 Pa.Super. 480, 635 A.2d 151, 154–55 (1993) (no strict liability under § 402A of the *Restatement* for doctors and hospitals because they are not "sellers" under that section; unlike manufacturers, doctors and hospitals are unable to effect risk distribution); *Goldfarb v. Teitelbaum,* 149 A.D.2d 566, 540 N.Y.S.2d 263, 264 (N.Y.App. Div.1989) (implantation of mandibular prosthesis not a "sale" of the device).

Support for the Duke Defendants' motion to dismiss Fuller's implied contract claim alleged in Count XXIII(d) can be found in *Grewe v. Mt. Clemens General Hosp.,* 47 Mich.App. 111, 209 N.W.2d 309, 310 (1973), 404 Mich. 240, 273 N.W.2d 429 (1978), in which the court dismissed a count alleging a contract claim because it was redundant with the plaintiff's medical malpractice claim, and *Cooper v. Edinbergh,* 97 Misc.2d 143, 410 N.Y.S.2d 962, 964 (N.Y.Sup.Ct.1978), which

held that the plaintiff's proper remedy for "maladministered treatment" was negligence and not a contract claim. These holdings are consistent with the law of North Carolina as described in *Batiste v. Am. Home Prods. Corp.*, 32 N.C.App. 1, 231 S.E.2d 269, *cert. denied*, 292 N.C. 466, 233 S.E.2d 921 (1977).

Based on the above discussion of North Carolina law, the Court holds that Counts I (products liability), IV through VII (breach of warranties and U.C.C. claims), XIII (market share), XXIII(b) (chain of distribution), and XXIII(d) (breach of implied contract) of Fuller's Complaint fail to state a claim upon which relief can be granted. Accordingly, those claims are dismissed.

### b. Common Plan and Joint Venture Claims (Counts XII, XVII, and XVIII)

In Count XII, Plaintiff Fuller alleges that the Defendants engaged in a "common plan to prevent public awareness of the hazards of TMJ implants." (Fuller Complaint ¶ 42.) Counts XVII and XVIII allege that the Defendants participated in and supervised "various joint ventures." (*Id.* at ¶¶ 47–48.) Fuller alleges no facts that could allow the inference that such a common plan or joint venture existed with respect to the Duke Defendants.

■■■ "To constitute a joint venture, the parties must combine their property, money, efforts, skill, or knowledge in some common undertaking. The contributions of the respective parties need not be equal or of the same character, but there must be some contribution by each coadventurer of something promotive of the enterprise." *Pike v. Wachovia Bank & Trust Co.*, 274 N.C. 1, 161 S.E.2d 453, 460 (1968) (quoting *In re Simpson*, 222 F.Supp. 904 (M.D.N.C.1963)). Where each defendant cannot direct the conduct of the others and there has been no "undertaking attended with risk by which defendants jointly sought a profit," a joint venture does not exist. *Id.* 161 S.E.2d at 461. Because Fuller has not alleged any facts that show she could be granted relief under the theories of joint venture or common plan, Counts XII, XVII, and XVIII must be dismissed.

### c. Intentional and Negligent Infliction of Emotional Distress and Fear of Injuries (Counts XIV, XV, and XVI)

Fuller alleges both intentional and negligent infliction of emotional distress against Defendants in Counts XIV and XV. In Count XVI she claims that "Plaintiff's fear of continuing and future injuries entitles her to recover from these defendants." (Fuller Complaint ¶¶ 44–46.) Even when the allegations in the Complaint and the inferences arising from the Complaint are construed favorably to Fuller, Counts XIV, XV, and XVI fail to state a claim upon which relief can be granted.

■■■ The elements of a claim for intentional infliction of emotional distress under North Carolina law are: "(1) extreme and outrageous conduct, (2) which is intended to cause and does cause (3) severe emotional distress to another." *Dickens v. Puryear*, 302 N.C. 437, 276 S.E.2d 325, 335 (1981); *see also Waddle v. Sparks*, 331 N.C. 73, 414 S.E.2d 22, 27 (1992). "Extreme and outrageous conduct" is also an element of a claim for negligent infliction of emotional distress. *Dickens*, 276 S.E.2d at 332. Fuller has failed to allege facts that support each of these elements.

There are no facts alleged in the Complaint that could refer to any conduct by the Duke Defendants that falls outside the bounds of societal norms. Thus, Plaintiff has failed to allege facts in support of the first element of her emotional distress claims, "extreme and outrageous conduct." Likewise, no facts are alleged regarding the intent of the Duke Defendants, an essential element of the intentional infliction of emotional distress claim.

Mere fright is not enough for a claim of negligent or intentional infliction of emotional distress; plaintiff must allege that she suffered "severe emotional distress as a proximate result of Defendant's negligence...." *Johnson v. Ruark Obstetrics & Gynecology Associates, P.A.*, 327 N.C. 283, 395 S.E.2d 85, 97 (1990). As the North Carolina Supreme Court observed in *Waddle v. Sparks*, 331 N.C. 73, 414 S.E.2d 22, 27 (1992), "Complete emotional tranquility is seldom attainable in

this world, and some degree of transient and trivial emotional distress is a part of the price of living among people. The law intervenes only where the distress inflicted is so severe that no reasonable [person] could be expected to endure it." Where, as here, a plaintiff does not allege any severe mental, emotional or psychological injury intentionally or negligently cause by the defendants, claims for infliction of emotional distress must be dismissed. *Johnson*, 395 S.E.2d at 97.

Because Plaintiff has not alleged any facts that could be construed as "extreme and outrageous conduct" on the part of Duke Defendants or "severe emotional distress," the Court dismisses Counts XIV, XV, and XVI. *Dickens v. Puryear*, 302 N.C. 437, 276 S.E.2d 325 (1981); *Johnson v. Ruark Obstetrics & Gynecology Ass'n, P.A.*, 327 N.C. 283, 395 S.E.2d 85, 97 (1990).

### d. Fraud (Counts IX and X)

Rule 9(b) of the Federal Rules of Civil Procedure requires that "[i]n all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity. Malice, intent, knowledge, and other condition of mind of a person may be averred generally." The plaintiff must set forth in the complaint "the time, place, and contents of the alleged fraudulent representation, as well as the identity of each person making the misrepresentation and what was obtained thereby." *Riley v. Murdock*, 828 F.Supp. 1215, 1225 (E.D.N.C.1993); *see also* 5 Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1297 (1990).

Fuller has not alleged when or where any representations were made to her about the TMJ implants or who made those alleged representations. Fuller has also failed to allege any facts that could give rise to the inference that the Duke Defendants had knowledge of any material facts that they may have concealed from her regarding the safety of the TMJ implant and its appropriateness for implantation in her TMJ. "Although Rule 9(b) permits knowledge to be averred generally, plaintiffs must still plead the events which they claim give rise to an inference of knowledge." *Devaney v. Chester*, 813 F.2d 566, 568 (2nd Cir.1987).

Because Plaintiff has not pled her fraud claims with sufficient particularity, Counts IX and X are dismissed. The Court dismisses those claims without prejudice.

### 3. State Law Claims for Medical Malpractice

The remaining counts of Fuller's Complaint are Count II (negligence), Count III (failure to warn), Count XI (*res ipsa loquitur*), Count XXI (punitive damages), Count XXIII(a) (lack of informed consent), Count XXIII(c) (failure to meet the standard of care), and Count XXIV (failure to supervise or monitor by Duke University). The Duke Defendants ask this Court to recommend that these claims be remanded back to the transferor court because they are separable from the other actions consolidated as part of the *TMJ Implants Products Liability Litigation*. Plaintiff Fuller agrees with this request.

Upon the suggestion of the transferee district court, the Judicial Panel on Multidistrict Litigation shall consider remand of any separable claim before the conclusion of consolidated pretrial proceedings. R.Proc.Jud. Panel Multidistrict Lit. 14(c)(ii).

> If and when the transferee judge determines that any action or claim is, in fact, ready for trial, or otherwise ready for remand because the common pretrial proceedings pertaining to that action or claim have been completed and the action or claim would no longer benefit from inclusion in the coordinated or consolidated pretrial proceedings, the transferee judge may suggest to the Panel that the Panel remand the action or claim to its transferor district.

*In re Multi–Piece Rim Prod. Liab. Lit.*, 464 F.Supp. 969, 975 (J.P.M.L.1979).

Having considered the arguments of Plaintiff Fuller, the arguments of the Duke Defendants, and the claims of the other parties to these actions, the Court determines that the claims of Plaintiff Fuller raised in Civ. No. 3–94–190 would no longer benefit from inclusion in these consolidated pretrial proceedings. The parties can more efficiently con-

duct discovery on the remaining claims in the transferor district, and the legal issues remaining apply only to the Duke Defendants. The Court therefore suggests that the Judicial Panel on Multidistrict Litigation remand *Fuller v. E.I. du Pont de Nemours, et al.,* Civ. No. 3–94–190, to its transferor district, the United States District Court for the Middle District of North Carolina.

## IV. CONCLUSION

Based on the undisputed evidence, the Court holds that a reasonable jury could not return a verdict in favor of Plaintiffs with respect to Defendants DuPont and American Durafilm. No genuine issues of material fact exist, and those Defendants are entitled to judgment as a matter of law. Finding no just reason for delay, the Court directs the Clerk of Court to enter judgment in favor of DuPont and American Durafilm on all claims against them.

In the individual action *Fuller v. E.I. du Pont de Nemours, et al.,* Civ. No. 3–94–190, the Court dismisses all claims except Counts II, III, XI, XXI, XXIII(a), XXIII(c), and XXIV. The Court recommends that the Judicial Panel on Multidistrict Litigation remand the *Fuller* action to the transferor court for resolution of these remaining claims with respect to the Duke Defendants.

Accordingly, **IT IS HEREBY ORDERED** THAT:

1. Defendant E.I. du Pont de Nemours & Company's Motion for Summary Judgment is GRANTED; and

2. Defendant American Durafilm's Motion for Summary Judgment is GRANTED; and

3. All of Plaintiffs' claims against Defendants E.I. du Pont de Nemours & Company and American Durafilm are DISMISSED WITH PREJUDICE; and

4. The Clerk shall enter judgment with respect to Defendants E.I. du Pont de Nemours & Company and American Durafilm; and

5. In *Fuller v. E.I. du Pont de Nemours, et al.,* Civ. No. 3–94–190, Defendants Edward A. Dolan, D.D.S., and Duke University's Motion to Dismiss is GRANTED with respect to Counts I, IV through X, XII through XX, XXIII(b) and XXIII(d); and

a. Counts I, IV through VIII, XII through XX, XXIII(b) and XXIII(d) in *Fuller* are DISMISSED WITH PREJUDICE; and

b. Counts IX and X in *Fuller* are DISMISSED WITHOUT PREJUDICE; and

6. The Court suggests that the Judicial Panel on Multidistrict Litigation remand all remaining claims in *Fuller v. E.I. du Pont de Nemours, et al.,* Civ. No. 3–94–190, to the transferor court.